In re: **MANAGED CARE LITIGATION**

**This Document Relates to Provider Track Cases**

**No. MDL 1334–MD.**

United States District Court,
S.D. Florida,
Miami Division.

Dec. 8, 2003.

*OMNIBUS ORDER GRANTING IN PART AND DENYING IN PART JOINT MOTION TO DISMISS THE SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT*

MORENO, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION ...............................................1271
 A. COMPLAINT...............................................1271

II. LEGAL STANDARD ...........................................1272

III. DISCUSSION...................................................1272
 A. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT .......................................................1273
 1. "ENTERPRISE" ........................................1273
 2. PREDICATE ACTS ......................................1277
 3. PROXIMATE CAUSE ....................................1280
 4. RICO CONSPIRACY ....................................1280
 5. EQUITABLE RELIEF UNDER RICO .......................1281
 6. MCCARRAN–FERGUSON ACT ...........................1283
 7. ARBITRABLE PRIMARY RICO CLAIMS ...................1285
 B. ERISA PREEMPTION ......................................1287
 1. SECTION 502 PREEMPTION ............................1289
 2. SECTION 514 PREEMPTION ............................1292
 3. EXHAUSTION OF REMEDIES ...........................1294
 C. CHOICE OF LAW .........................................1296
 D. STATE COMMON LAW CLAIMS ...........................1297
 1. QUASI–CONTRACT CLAIMS ...........................1297
 E. STATE STATUTORY CLAIMS...............................1298
 1. PROMPT PAY: PRIVATE RIGHT OF ACTION .............1298
 2. CAL. BUS. & PROFESSIONS CODE § 17200 .............1300
 3. NEW JERSEY CONSUMER FRAUD ACT ..................1303
 F. MEDICAL ASSOCIATION STANDING........................1305

 1. INDIVIDUAL STANDING: INJURY–IN–FACT ....................1305
 2. REPRESENTATIVE STANDING ...............................1307
 G. PARENT–SUBSIDIARY RESPONSIBILITY .........................1308

IV. CONCLUSION............................................1310

## I. INTRODUCTION

This multi-district litigation involves two separate categories of plaintiffs who have filed suit against various insurance companies that provide managed care. One group of plaintiffs consists of Providers[1] who allege that the managed care company defendants, both individually and in combination, engaged in a pattern of failing to pay claims in full and in a timely manner, thereby breaching certain agreements and selected federal and state statutes. The Providers include those in the Main Track nationwide class action complaint as well as certain tag-along plaintiffs transferred to this Court from locations around the country by the Judicial Panel on Multi–District Litigation.

Before the Court is the second phase of motions to dismiss in the Provider track of this litigation. Defendant managed care companies[2] jointly seek to dismiss various portions of the Main Track Second Amended Consolidated Class Action Complaint for failure to state a claim upon which relief can be granted. Through numerous pleadings spanning many months and a hearing on August 14, 2003, these well-matched parties have participated in a classic legal contest. For the reasons outlined below, the joint motion to dismiss is GRANTED in part and DENIED in part consistent with this opinion.

### A. COMPLAINT

The Main Track Second Amended, Consolidated Class Action Complaint (the "SAC") (D.E. No. 1607) contains ten separate causes of action: (1) RICO conspiracy, 18 U.S.C. § 1962(d); (2) RICO aiding and abetting, 18 U.S.C. § 2((1) and (2) collectively referred to herein as "secondary RICO violations"); (3) primary RICO, 18 U.S.C. § 1962(a) & (c); (4) RICO declaratory and injunctive relief, 18 U.S.C. § 1964(a); (5) breach of contract; (6) unjust enrichment/constructive contract; (7) violation of various state prompt pay statutes; (8) violation of the California Business & Professions Code § 17200; (9) violation of the Connecticut Unfair Trade

---

**1.** The Main Track Provider Plaintiffs include: Charles B. Shane, M.D., Jeffrey Book, D.O., Michael Burgess, M.D., Edward L. Davis, D.O., Lance R. Goodman, M.D., R. Robert Harrison, M.D., Glenn L. Kelly, M.D., Leonard J. Klay, M.D., Eugene Mangieri, M.D., Kevin Molk, M.D., Martin Moran, M.D., Manuel Porth, M.D., Thomas Backer, M.D., David Boxstein, M.D., Susan Hansen, M.D., Andres Taleisnik, M.D., Julio Taleisnik, M.D., Roger Wilson, M.D., Navid Ghalambor, M.D., the California Medical Association, the Texas Medical Association, the Medical Association of Georgia, the Florida Medical Association, the Louisiana State Medical Association and the Denton County Medical Association (collectively referred to as "Plaintiffs" or "Providers").

**2.** The Main Track Defendants include: UnitedHealthcare, Inc. and UnitedHealth Group Incorporated f/k/a United HealthCare Corporation ("United"); Health Net, Inc. f/k/a Foundation Health Systems, Inc. ("Health Net"), WellPoint Health Networks, Inc. ("WellPoint"), The Prudential Insurance Company of America ("Prudential"), CIGNA Corporation ("CIGNA"), PacifiCare Health Systems, Inc. ("PacifiCare"), Humana, Inc. and Humana Health Plan, Inc. ("Humana"), Coventry Health Care, Inc. ("Coventry"), and Anthem, Inc. ("Anthem") (collectively referred to herein as "Defendants" or "HMOs").

Practices Act[3]; and (10) violation of the New Jersey Consumer Fraud Act.

## II. LEGAL STANDARD

A court will not grant a motion to dismiss unless the plaintiff fails to prove any facts that would entitle the plaintiff to relief. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.,* 795 F.2d 948 (11th Cir.1986).

## III. DISCUSSION

Coventry, Health Net, Humana, Pacifi-Care, Prudential, United, and WellPoint have filed a joint motion to dismiss the SAC.[4] Anthem and Coventry have also filed separate motions to dismiss.[5] The Court has issued several Orders of Dismissal as to previous versions of both Provider and Subscriber Track complaints. Many of these previous rulings are pertinent to resolution of the instant motions.

(1) The Court rejected Defendants' position that claims under 18 U.S.C.1962(a) must result from the "investment" of racketeering proceeds, rather than merely flow from predicate acts of racketeering. *See St. Paul Mercury Ins. Co. v. Williamson,* 224 F.3d 425, 441 (5th Cir.2000); *Fogie v. THORN Americas, Inc.,* 190 F.3d 889, 899 (8th Cir.1999); *Vemco v. Camardella,* 23 F.3d 129, 132 (6th Cir.1994). The Court adopted the minority position that does not require an investment use injury independent of the alleged predicate acts under Section 1962(a). *See In re Managed Care Litig.,* 150 F.Supp.2d 1330, 1351–52 (S.D.Fla.2001); *See also Busby v. Crown Supply,* 896 F.2d 833, 836–40 (4th Cir. 1990); *accord Avirgan v. Hull,* 691 F.Supp. 1357, 1362 (S.D.Fla.1988), *aff'd,* 932 F.2d 1572 (11th Cir.1991). Nonetheless, in the most recent version of the Complaint, Plaintiffs have alleged that they suffered injury from Defendants' "investment and reinvestment of [racketeering] income ... to operate, expand and perpetuate [the Managed Care Enterprise]." SAC ¶¶ 186, 192, 197.

(2) The Court rejected Defendants' position that *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), supercedes Eleventh Circuit precedent that authorizes a private cause of action for "aiding and abetting" a RICO violation pursuant to 18 U.S.C. § 2. *See In re Managed Care Litig.,* 135 F.Supp.2d 1253, 1267 (S.D.Fla.2001); *see also Cox v. Adm'r U.S. Steel & Carnegie,* 17 F.3d 1386 (11th Cir.1994); *cf. Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1204 (11th Cir. 2001).

(3) The Court held that the central enterprise allegations underlying all of Plaintiffs' RICO claims were untenably broad, and that the supporting averments were too vague, incomplete or indefinite. Plaintiffs failed to identify the third-party entities which formed the enterprise, and also did not provide sufficient detail regarding the links between these third-party entities. Accordingly, the Court directed

---

**3.** Count IX only applies to Aetna entities which have settled their claims. In accordance with the Final Approval Order and Judgment as to Aetna, Inc. and Aetna–U.S. Healthcare, entered **October 24, 2003**, this Count is therefore dismissed.

**4.** Aetna and CIGNA have settled their claims.

**5.** The motions to dismiss filed by Anthem and Coventry shall be dealt with in a separate order.

Plaintiffs to "identify who comes within the ambit of [the RICO] enterprise, or where [plaintiffs' RICO claims] begin and end." *In re Managed Care Litig.,* 135 F.Supp.2d 1253, 1262 (S.D.Fla.2001).

(4) With regard to state prompt-pay statutes, the Court required Plaintiffs to "identify which state statutes are being alleged and which Defendants are alleged to have violated which statute" and "state how each Defendant violated the statute." *Id.* at 1269–70.

## A. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (COUNTS I–IV)

 The Racketeer Influenced and Corrupt Organizations Act ("RICO") provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Therefore, "to state a RICO claim, a plaintiff must plead (1) that the defendant (2) through the commission of two or more acts (3) constituting a 'pattern' (4) of 'racketeering activity' (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an 'enterprise' (7) the activities of which affect interstate or foreign commerce." *McCulloch v. PNC Bank,* 298 F.3d 1217, 1225 (11th Cir.2002). "Racketeering activity" is defined to include "any act which is indictable under a lengthy list of criminal offenses." *Langford v. Rite Aid of Ala., Inc.,* 231 F.3d 1308, 1312 (11th Cir.2000).

### 1. "ENTERPRISE"

#### a. Requirement of a Discernible "Entity"

 Defendants argue that the SAC again fails to define a sufficiently discrete enterprise for purposes of RICO liability. Plaintiffs include the following entities within their definition of the Managed Care Enterprise ("MCE"): Defendants, their trade associations, a few named vendors, unidentified "health insurance companies not named as defendants herein," and "other third party entities." SAC ¶¶ 26–31. Plaintiffs previously alleged that the RICO enterprise comprised the entire health care industry, including both providers and the numerous different companies connected in some professional fashion with the nation's system for providing private health care coverage. While the scope of the alleged enterprise is still quite large, the Court finds that Plaintiffs have answered the challenge and added the requisite amount of detail to successfully allege an association-in-fact enterprise.

 An association-in-fact enterprise requires the existence of an *entity,* "an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit." *United States v. Turkette,* 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *see also NOW v. Scheidler,* 510 U.S. 249, 259 n. 5, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994) (noting that an "enterprise" under Section 1962(a) must "be an entity that was acquired through illegal activity," whereas an "enterprise" under Section 1962(c) is "generally the vehicle through which the unlawful pattern of racketeering is committed, rather than the victim of that activity"). Whether the enterprise is the prize, victim, instrument, or perpetrator, this requirement ensures that all RICO enterprises have a structure and some mechanism for "controlling and directing the affairs of the enterprise on an ongoing, rather than *ad hoc* basis." *United*

States v. Riccobene, 709 F.2d 214, 222–23 (3d Cir.1983); Bachman v. Bear Stearns & Co., 178 F.3d 930, 932 (7th Cir.1999) (stating that a RICO enterprise requires "continuity of structure and personality," the ability "to hold [itself] together through time," and "hierarchal or consensual decision-making").

While in particular cases the proof used to establish the enterprise and the racketeering pattern requirements may coalesce, the possibility of evidentiary overlap does not detract from the fact that the existence of an enterprise remains a separate element. Turkette, 452 U.S. at 583, 101 S.Ct. 2524 ("The 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern."). A RICO enterprise "require[s] a certain amount of organizational structure which eliminates simple conspiracies from the Act's reach. That is, simply conspiring to commit a fraud is not enough to trigger the Act if the parties are not organized in a fashion that would enable them to function as racketeering organization for other purposes." VanDenBroeck v. CommonPoint Mortgage Co., 210 F.3d 696, 699 (6th Cir.2000); Fitzgerald v. Chrysler Corp., 116 F.3d 225, 228 (7th Cir.1997). Since "diverse parties ... customarily act for their own gain or benefit in commercial relationships," a complaint founded on commercial relationships between the alleged components of the enterprise should plead facts "dispel[ling] the notion that the different parties entered into [the alleged] agreements ... for their own gain or benefit." Stachon v. United Consumers Club, Inc., 229 F.3d 673, 677 n. 4 (7th Cir.2000).

Defendants argue that the SAC's factual averments are insufficient even to allege concerted action that legally amounts to a conspiracy, much less an "entity" with the type of ongoing organization and structure necessary to meet RICO's enterprise requirement. They claim that Plaintiffs' new allegations of a MCE continue to cast too wide a net, in effect over an entire industry. Moreover, Defendants assert that there are no specific factual allegations showing a common link between the alleged participants. Thus, they assert that this "nebulous, open-ended description" is insufficient. Richmond v. Nationwide Cassel, L.P., 52 F.3d 640, 645 (7th Cir.1995); see also Brannon v. Boatmen's First Nat'l Bank of Okla., 153 F.3d 1144, 1149 (10th Cir.1998). Once again, Defendants turn to authority outside the Eleventh Circuit holding that severally contracting with various Defendants is insufficient.[6]

---

6. See, e.g., 800537 Ontario, Inc. v. Auto Enters., Inc., 113 F.Supp.2d 1116, 1123 (E.D.Mich.2000) (finding that two importers did not participate in "any type of hierarchy beyond their contractual relationship"); Stachon v. United Consumers Club, Inc., No. 98 C 7020, 1999 WL 971284 (N.D.Ill. Oct. 21, 1999), aff'd, 299 F.3d 673 (7th Cir.2002) (finding that buying club and its contracting manufacturers, suppliers and members established a discrete market, not an on-going enterprise); see also In re MasterCard Int'l, Inc., Internet Gambling Litig., 132 F.Supp.2d 468, 486–87 (E.D.La.2001) (finding that Internet casinos, credit card companies and issuing banks merely constituted "a routine contractual combination for the provision of financial services"); In re SmithKline Beecham Clinical Labs., Inc. Lab. Test Billing Practices Litig., 108 F.Supp.2d 84, 94 (D.Conn.1999) (finding that network of laboratories either owned, affiliated or in varying contractual arrangements with SBCL was insufficient); El-Issa v. Compaq Computer Corp., No. 97 C 5839, 1997 WL 790730, at *3 (N.D.Ill. Dec. 19, 1997) (finding that competing retail distribution agents for Compaq computers were not an enterprise, even though they train together on Compaq computers and act as conduits for allegedly false Compaq advertising); First Nationwide Bank v. Gelt Funding Corp., 820 F.Supp. 89, 98 (S.D.N.Y.1993) ("Plaintiff merely asserts that for over six years [brokers] shared common fraudulent purposes and plans. Conclusory allegations that disparate

Yet, the Eleventh Circuit has not bound itself to strict metaphysical structural requirements and has authorized just the type of allegations made in this case.

"An enterprise under [RICO] is any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact though not a legal entity. Moreover, under our case law, a RICO enterprise need not possess an ascertainable structure distinct from the association necessary to conduct the pattern of racketeering activity.... We have held that *Turkette* left intact this Circuit's holding in *United States v. Elliott*, 571 F.2d 880 (5th Cir.1978), that the definitive factor in determining the existence of a RICO enterprise is the existence of an association of individual entities, however loose or informal, that furnishes a vehicle for the commission of two or more predicate crimes, that is, the pattern of racketeering activity requisite to the RICO violation."

*United States v. Goldin*, 219 F.3d 1271, 1274–75 (11th Cir.2000) (internal quotations and citations omitted). Indeed, "[A] RICO enterprise may be an 'amoeba-like' structure of a loose informal association." *Avirgan v. Hull*, 932 F.2d 1572, 1578 (11th Cir.1991) (citing *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir.1983)), *cert. denied*, 502 U.S. 1048, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). Plaintiffs argue that the SAC satisfies *Goldin* and cures the deficiencies previously noted by the Court. *See* SAC ¶¶ 126–131.

While Defendants protest that the level of factual detail has not been reached, the pleadings are justifiably limited at this stage because Plaintiffs have not had the aid of discovery. The Court finds that the preliminary sketch of a RICO enterprise provided by the Plaintiffs adequately meets the Court's challenge. Moreover, although the MCE that the Provider Plaintiffs have alleged is admittedly larger in scope than the one found sufficient in the Subscriber Track, there are a few analogous similarities. First, the Plaintiffs have not bundled a random assortment of contracts and labeled it an enterprise. Each of the entities are tied together with the common purpose established by the Defendants. Second, the associations and third-party entities are alleged to have a stake in the ongoing function of the enterprise. Indeed, the links between the entities go beyond ordinary contractual bonds—for example, the hiring of each other's senior-level employees, the use of similar patient care guidelines and computer software packages, and formation and membership in trade associations that unify the industry voice. SAC ¶ 130.

Every individual entity plays a role in the enterprise equation: each Defendant and their subsidiaries throughout the country; other health insurance companies not expressly named; third party entities that develop claims processing systems or components; third party entities which promulgate patient care guidelines; third party entities that Defendants hire to review and wrongfully deny claims; trade associations; and a health industry database, MedUnite. SAC ¶ 127. The maintenance of this organized system requires an ongoing enterprise. Accordingly, the Plaintiffs have set out to the Court's satisfaction the associational links comprising the Managed Care Enterprise and the Court therefore finds that Plaintiffs have

---

parties were associated in fact by virtue of their involvement in the real estate industry in the 1980s are insufficient to sustain a RICO claim, absent allegations as to how the members were associated together in an 'enterprise.' ").

sufficiently alleged an enterprise for the purposes of RICO.

### b. Antitrust in Disguise

▮▮▮▮▮ Defendants next argue that Plaintiffs' concentration on "market dominance" confirms that the SAC is nothing more than vague antitrust allusions impermissibly dressed in RICO garb. SAC ¶¶ 112–15, 130. RICO's history indicates that Congress did not intend for it to be used as a vehicle for evading the strict legal requirements applicable to antitrust claims. *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 498–99, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Moreover, RICO enterprises are entities that might be victimized by, or used as vehicles for, the commission of the crimes enumerated by RICO. *NOW v. Scheidler,* 510 U.S. 249, 259 n. 5, 114 S.Ct. 798 (1994). Defendants claim that if Plaintiffs are allowed to proceed on their collusive-industry enterprise theory, all businesses might face similar liability for engaging in business practices that have not been shown to harm consumers or competition. Plaintiffs should not be able to use RICO to evade the requirements of applicable antitrust law.

The broader regulation of competition, markets or lines of commerce remains the exclusive focus of antitrust laws. *Jennings v. Emry,* 910 F.2d 1434, 1438 (7th Cir.1990) (holding that antitrust conspiracy allegations are not "racketeering acts" under RICO, because a "violation of antitrust law is not a predicate act under RICO"); *Prince Heaton Enters., Inc. v. Buffalo's Franchise Concepts, Inc.,* 117 F.Supp.2d 1357, 1363 (N.D.Ga.2000); *Schwartz v. Hosp. of Univ. of Pa.,* CIV A. No. 88–4865, 1993 WL 153810, *7 (E.D.Pa. May 7, 1993) (finding that plaintiff could not advance a RICO claim that "is dependent on an antitrust violation.").

Defendants contend that Plaintiffs' "antitrust" averments would require dismissal under settled doctrine, as evidenced by their failure to allege harm to competition or define the relevant product and geographic markets. *Feldman v. Palmetto Gen. Hosp., Inc.,* 980 F.Supp. 467, 469 (S.D.Fla.1997); *see also Wagner v. Magellan Health Servs., Inc.,* 121 F.Supp.2d 673, 682 (N.D.Ill.2000). In the process of asserting that Plaintiffs' claims have antitrust implications, however, Defendants actually undermine their position that Plaintiffs' RICO claims encroach on antitrust territory when they attempt to demonstrate that an antitrust claim does not exist. Indeed, the fact that Defendants might be legitimate organizations does not take them out of RICO's ambit. *See Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. at 499, 105 S.Ct. 3275 (1985). Defendants urge the Court to adopt some sort of antitrust preemption, but none has been statutorily authorized by Congress.

### c. "Operation and Management" of the Enterprise

▮▮▮▮▮ Section 1962(c) imposes RICO liability on a defendant only if it "conduct[s]" or "participate[s] ... in the conduct" of an enterprise. Congress' insistence that the defendant must have "conduct[ed]" the affairs of the enterprise is not merely synonymous with "aid and abet," or otherwise "superfluous," but rather constitutes a separate and distinct requirement. *Reves v. Ernst & Young,* 507 U.S. 170, 178, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993). Accordingly, Defendants must exercise "some degree of direction" of the enterprise as well as an element of "control." *Id.* at 179, 184, 113 S.Ct. 1163. "[L]iability depends on showing that the defendants conducted or participated in the conduct of the 'enterprise's affairs,' not just their own affairs." *Id.* at 185, 113 S.Ct. 1163; *Brannon v. Boatmen's First*

*Nat. Bank of Oklahoma,* 153 F.3d 1144, 1146 (10th Cir.1998).

Defendants argue that Plaintiffs merely recycle allegations of individual predicate acts that each Defendant is alleged to have committed in the course of the operation of its own business. SAC ¶¶ 112–14, 130. Nevertheless, the Court finds that these allegations are sufficient at this stage. Plaintiffs begin by alleging that Defendants have violated Section 1962(c) "by conducting ... the affairs of the Managed Care Enterprise." *See* Am. RICO Case Statement ¶ 6(d). Plaintiffs paint a further picture of the enterprise's operation and control by alleging that Defendants played a part in directing the affairs of the enterprise by developing guidelines and standards to use as criteria to deny claims, by hiring others to develop automated systems for manipulating claims, by creating MedUnite as a common entry point for physician data, and by approving on a CEO by CEO basis the joint actions of the Coalition for Quality Healthcare. SAC ¶ 130(a), (c), (f) & (g). These allegations, if established, would show that the MCE furnishes a vehicle for the commission of continuing predicate crimes with the Defendants squarely in the driver's seat. While Defendants quibble about needing more specificity regarding the operation and control of the enterprise, the Court nevertheless finds that Plaintiffs have alleged the basic contours of control necessary to survive a Fed.R.Civ.P. 12(b)(6) motion.

## 2. PREDICATE ACTS

### a. "Breach as Fraud" Theory

■ Anthem and the Joint Defendants contend that Plaintiffs' mail and wire fraud allegations amount at most to breach of contract (or quasi-contract) not the criminal fraud prohibited by 18 U.S.C. §§ 1341, 1343·which constitute RICO predicate acts. They argue that most of the representations alleged·by Plaintiffs are merely communications that announce the disposition of a particular request for contractual reimbursement. *See* Amended RICO Case Statement ¶¶ 70–237. Plaintiffs, however, allege that each Defendant became guilty of fraud by failing to disclose secret cost containment mechanisms—such as the use of computer software to review claims—that Defendants allegedly use to deny, diminish and delay payment for covered, medically necessary services. SAC ¶¶ 78, 84–96. Rather than honoring their contractual and quasi-contractual obligations, Defendants "use cost-based or other actuarial criteria unrelated to [contractual and quasi-contractual] requirements to approve and deny claims submitted by Plaintiffs and the class." *Id.* ¶ 84.

■ At the outset, the Court notes that simple allegations of withholding or delaying payment under a contract, even for extortionate purposes, do not constitute criminal mail and wire fraud. *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1318–19 (11th Cir.1998); *see also United States v. D'Amato,* 39 F.3d 1249, 1261 n. 8 (2d Cir.1994); *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir. 1990). Moreover, nondisclosure of an intent not to perform a contract generally cannot be used to bootstrap a fraud claim, since the mail and wire fraud statutes only proscribe representations designed to defraud. *McNally v. United States,* 483 U.S. 350, 357, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); *Reynolds v. E. Dyer Dev. Co.,* 882 F.2d 1249, 1252 (7th Cir.1989); *Zemans v. Karris,* No. 87 C 171, 1989 WL 13161, *1 (N.D.Ill. Feb. 16, 1989).

■ In addition, the Court also notes that the Defendants' arguments do not apply to Plaintiffs who treated Defendants' insureds outside of any contractual

relationship. Further, as to the contractual claims, commercial contractual relationships are generally not the type of special relationship of trust that imposes an affirmative duty to disclose information. *Langford v. Rite Aid,* 231 F.3d 1308, 1314 (11th Cir.2000). However, contractual settings can provide the context for RICO mail fraud claims if there is a pattern of misrepresentations amounting to both a scheme to defraud and racketeering activity, *Robert Suris Gen. Contractor Corp. v. New Metro. Fed. Sav. & Loan Ass'n,* 873 F.2d 1401, 1404 (11th Cir.1989); *United States v. Kreimer,* 609 F.2d 126, 128 (5th Cir.1980). Concealment of critical data, even without a formalized duty to disclose, may also constitute mail and/or wire fraud in certain situations. *Langford,* 231 F.3d at 1312–13.

In the SAC, the Plaintiffs allege a fraudulent scheme based upon the failure to disclose a plethora of automated processing techniques to diminish, deny or delay payments. SAC ¶ 78. *See McNally v. United States,* 483 U.S. 350, 357, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); *Reynolds v. E. Dyer Dev. Co.,* 882 F.2d 1249, 1252 (7th Cir.1989). These contractual promises were allegedly *never* intended to be performed. Moreover, the allegations in the SAC can be distinguished from *Johnson Enterprises,* cited by Defendants, where the corporate defendant's undue delay in payment did not constitute criminal fraud as it did not constitute a "scheme to defraud". *Johnson Enters. of Jacksonville, Inc. v. FPL Group, Inc.,* 162 F.3d 1290, 1318–19 (11th Cir.1998). In contrast, these failed disclosures alleged in the SAC go to 'the heart of their relationship' and disclosure was necessary to prevent the doctors from being misled by Defendants' apparent actions and statements. Therefore, the allegations, if proven, constitute circumstances that might trigger a duty to disclose. *See, e.g., United States v.*

*Brown,* 79 F.3d 1550, 1558 (11th Cir.1996) ("it can be criminal fraud for a seller to conceal, or even fail to disclose, information after already affirmatively misleading customers about material facts").

While Defendants insist on focusing on the individual contractual level in this class action, the Plaintiffs' allegations of a fraudulent scheme takes place on a far wider systematic level—a significant distinction. Accordingly, while their claims are indeed embedded in a contractual relationship, Plaintiffs's allegations of mail fraud continue to be viable.

**b. Fraud Claims and Fed.R.Civ.P. 9(b)**

■ The Joint Defendants also argue that all the fraud claims are not pled with the requisite particularity. Fed.R.Civ.P. 9(b); *see also United States ex rel. Clausen v. Lab. Corp. of Am.,* 290 F.3d 1301, 1310 (11th Cir.2002). The Court previously held that Plaintiffs' allegations of "downcoding, CPT code manipulation, improper bundling and use of inappropriate criteria to deny or reduce claims" satisfied Fed.R.Civ.P. 9(b) and thus "properly pled against each Defendant predicate acts of mail and wire fraud constituting a continuing pattern of racketeering activity." *See In re Managed Care Litig.,* 135 F.Supp.2d 1253, 1263 (S.D.Fla.2001). The Court has not had occasion, however, to address the Plaintiffs' capitation-related allegations contained in the SAC.

Plaintiffs allege that Defendants misrepresent that their capitation rates are actuarially sound, SAC ¶ 103, that Defendants overcharge risk funds for the cost of prescription medicine, *id.* ¶ 106, that Defendants manipulate pharmacy risk pools so that there is never any money in the pools at the end of the year to pay doctors, *id.* ¶ 107, and that Defendants delay furnishing providers with initial capitation payments, *id.* ¶¶ 104–05. Moreover, Plain-

tiffs allege that the Providers possessing capitation agreements with one or more of the Defendants receive monthly capitation rolls supposedly listing the patients in their group, but that the rolls do not include enrolled patients who have yet to seek any treatment, allowing Defendants to retain the full premiums for "well" members and forcing the doctors to absorb the costs of treating a group artificially inflated with sick patients. SAC ¶¶ 105–106

Defendants claim that Plaintiffs have provided only one allegation of fraud relating to one Defendant's capitation payments and have provided no specific allegations of fraud relating to any Defendant's risk sharing arrangements. Once again, this argument hinges on levels of specificity which are not required at this stage. Plaintiffs have provided the same level of detail in the capitation allegations as they did for the claims processing allegation, which this court found sufficient for the purposes of pleading RICO mail and wire fraud. Similarly, other courts have found that such detail is not required for numerous misrepresentations that occur over an extended period of time. *Fujisawa Pharmaceutical Co. v. Kapoor*, 814 F.Supp. 720, 726 (N.D.Ill.1993); *Sunbird Air Servs., Inc. v. Beech Aircraft Corp.*, 789 F.Supp. 364, 366 (D.Kan.1992); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 20 F.Supp.2d 1017 (S.D.Tex.1998). Accordingly, Plaintiffs have provided the requisite allegations which allow their claims to proceed.

**c. Deprivation of a Property Interest**

 Striking at the substantive merits of Plaintiffs' mail and wire fraud claims, Defendants contend that Plaintiffs' claims of mail and wire fraud cannot be proven as a matter of law because the Plaintiffs have not alleged the deprivation of any cognizable property interest.

The Supreme Court has held that the "mail fraud statute is limited in scope to the protection of property rights." *McNally v. United States*, 483 U.S. 350, 360, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). This is because "the original impetus behind the mail fraud statutes was to protect the people from scheme to deprive them of their money or property." *Id.* at 356, 107 S.Ct. 2875. Defendants argue that the providers possess services, and even though they expect to give that up in exchange for money, that does not make it a property interest. Defendants' arguments have principally arisen in the wake of the recent *Scheidler v. NOW* decision, where the Supreme Court held, among other things, that by interfering with "a woman's right to seek medical services from a clinic" and "the right of the doctors, nurses, or other clinic staff to perform their jobs" individual and corporate entities did not "obtain" or attempt to obtain a property right from women's rights organization or abortion clinics.[7] *Scheidler v. NOW*, 537 U.S. 393, 399–402, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003).

Plaintiffs, however, argue that services indeed can be considered property, and allegations that they performed the services and were defrauded out of rightful monetary payments easily falls under the rubric of a property interest. The Court agrees. The allegations in part concern a scheme using claims processing mechanisms to deny, diminish, and delay payments for services that have been performed. Therefore, the providers are being deprived of a property right—in

---

7. Plaintiffs have withdrawn their claims of extortion under the Hobbs and Travel Acts.

*See* Transcript of Motion to Dismiss Hearing, p. 15.

this case money rightfully theirs—in perhaps the most legally primitive sense.

### 3. PROXIMATE CAUSE

Defendants argue that Plaintiffs' allegations that Defendants have injured individual physicians by economically manipulating the entire managed care industry fail under RICO's stringent proximate cause requirements. *Holmes v. Sec. Invest. Prot. Corp.*, 503 U.S. 258, 267–68, 272–73, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (requiring "some direct relation between the injury asserted and the injurious conduct alleged" and stating that RICO's reach does not extend past the intervening acts of third parties).

In the SAC, Plaintiffs have alleged that their injuries result from the participants in the managed care industry who have been "coerced" into participating in Defendants' supposed "scheme." For example, Plaintiffs allege that Defendants' subsidiaries enter into capitation agreements with providers through independent medical groups ("IPAs"). Many of these IPAs themselves receive monthly capitation payments for each enrolled patient and agree to assume responsibility for processing and paying the claims of their individual doctors. According to Plaintiffs, Defendants' fraudulent misrepresentations render those payments actuarially unsound and cause the group's capitation fund to run dry.

Defendants argue that it is speculation whether an individual doctor's failure to receive payments is directly attributable to insufficient capitation payments as opposed to the business practices of individual medical groups or IPAs, including their administrative overhead, efficiency and claims processing procedures. *See Holmes*, 503 U.S. at 258, 112 S.Ct. 1311. Even assuming that the appropriate assessment of factual causation could be made out with respect to some members, Defendants argue that this would be determinable in many cases only after culling out those members whose incomes were reduced as a result of mistakes or poor business practices and then apportioning damages among individual members accordingly. The ensuing causal investigation would open the door to the kind of "massive and complex damages litigation" that *Holmes* held had no place in RICO. *Id.* at 274, 112 S.Ct. 1311.

The Court disagrees. Exploring Defendants' nightmarish causal scenario is inappropriate at this stage and Defendants fail in their attempt to create multiple layers of attenuation. Nothing like the extended chain of causation that existed in *Holmes* exists here—indeed, Defendants' conduct is alleged to be the precipitating force in the Plaintiffs' injuries in a simple causal relationship. The fee-for-service Plaintiffs are injured when their bills are not paid in full by the Defendants. The capitation Plaintiffs are injured when they fail to receive payment, in this case, the full capitation payments that they are entitled to, directly or indirectly, through the IPAs that pass them along. Accordingly, Plaintiffs have satisfactorily alleged proximate cause.

### 4. RICO CONSPIRACY (SECTION 1962(D))

To successfully allege a Section 1962(d) claim, a plaintiff must allege "that the conspirators agreed to participate directly or indirectly in the affairs of an enterprise through a pattern of racketeering activity." *United States v. Castro*, 89 F.3d 1443, 1451 (11th Cir.1996). Proof of an agreement to participate in a RICO conspiracy can be established by either: (1) "showing an agreement of an overall objective or (2) in the absence of an agreement on an overall objective, by showing

that a defendant agreed personally to commit two predicate acts." *United States v. Church*, 955 F.2d 688, 694 (11th Cir.1992), *cert. denied*, 506 U.S. 881, 113 S.Ct. 233, 121 L.Ed.2d 169 (1992). Plaintiffs must allege both that the conspirators agreed to participate in the affairs of an enterprise through a pattern of racketeering activity, *see United States v. Castro*, 89 F.3d at 1451, and sufficient conduct on the part of the participants that such an agreement can be inferred, *see United States v. Church*, 955 F.2d at 694. The existence of an agreement to further illegal acts is the key. *In re Asbestos Sch. Litig.*, 46 F.3d 1284, 1290 (3d Cir.1994). Paragraphs 165 and 166 of the SAC allege the formal RICO conspiracy language for both Sections 1962(a) and (c).

Defendants argue that Plaintiffs' conspiracy allegations merely allege conscious parallelism and constitutionally protected (First Amendment) conduct. *See* SAC ¶¶ 116, 118, 120 ("Defendants employ similar business practices in dealing with claims for reimbursement and participate in trade associations and other industry groups that are vehicles for the exchange of sensitive information."). Defendants assert that this is an insufficient factual basis from which to infer an agreement to violate RICO. *O'Malley v. O'Neill*, 887 F.2d 1557, 1560 (11th Cir.1989); *Schiffels v. Kemper Fin. Servs., Inc.*, 978 F.2d 344, 352 (7th Cir.1992). They argue that evidence of membership in trade associations or other similar groups "is not probative of conspiracy." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982); *Blomkest Fertilizer, Inc. v. Potash Corp.*, 203 F.3d 1028, 1038 (8th Cir.2000); *In re Citric Acid Litig.*, 191 F.3d 1090, 1097–98 (9th Cir.1999). Nor is conspiracy demonstrated by "consciously parallel action" among industry members who belong to the same industry groups. *Consolidated Metal Prods., Inc.*

*v. Am. Petroleum Inst.*, 846 F.2d 284, 293–94 n. 30 (5th Cir.1988).

In the previous Order of Dismissal, this Court found that the Plaintiffs had adequately pled a conspiracy claim under Section 1962(d). Nevertheless, the claim was dismissed due to a defect in the enterprise allegations. Now that the Court has found that the Plaintiffs have satisfied the enterprise pleading requirements in the newest iteration of the complaint, there is no reason to depart from the previous finding. Indeed, close inspection of the SAC demonstrates that Plaintiffs continue to satisfy the pleading requirements. An agreement to the overall objective of the conspiracy as well as to commit predicate acts is contained in Paragraph 117, the functional necessity of such an agreement is contained in Paragraph 118, and sub-agreements, like agreeing to use the same standards, guidelines and automated processing techniques to deny or diminish claims are alleged in Paragraph 130(b) and (d). Paragraphs 112 through 120 of the SAC allege conduct from which the requisite agreement can be inferred.

▆▆▆▆ As to the First Amendment concerns, Plaintiffs' allegations go far beyond participation in trade associations. The First Amendment does not protect illegal conduct implemented through trade associations. *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 926, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982). Thus, discovery is necessary to determine the significance and probative value of these associational activities.

## 5. EQUITABLE RELIEF UNDER RICO (COUNT IV)

▆▆▆▆ Defendants argue that RICO does not authorize a private plaintiff to obtain equitable or declaratory relief, only treble damages. 18 U.S.C. § 1964(a). Section

1964(a) grants district courts "jurisdiction to prevent and restrain violations" of RICO by issuing various forms of injunctive relief—including "ordering dissolution or reorganization"—but does not expressly set forth a cause of action for any sort of relief. Section 1964(b) states that "[t]he Attorney General may institute proceedings under this section," and that "[p]ending final determination thereof," the court may enter appropriate interim restraining orders. Section 1964(c) provides that "[a]ny person injured in his business or property by reason of a [RICO] violation ... may sue ... and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee."

There is no controlling legal precedent that governs the Court's disposition of this issue. Defendants argue, however, that based upon the text, structure and history of the statute, only the Attorney General may seek final and interim injunctive relief. A slim plurality of courts of appeals appear to agree, but most have addressed the issue in terms of interim or temporary equitable relief. *Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1087 (9th Cir.1986) (addressing the availability of interim injunctive relief); *In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir.1988) (holding that interim injunctive relief was unavailable); *Sedima, S.P.R.L. v. Imrex*, 741 F.2d 482, 489 n. 20 (2d Cir.1984), *rev'd on other grounds*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *see also Johnson v. Collins Entm't Co.*, 199 F.3d 710, 726 (4th Cir. 1999) (expressing doubt as to the availability of injunctive relief for private plaintiffs); *cf. Bennett v. Berg*, 685 F.2d 1053, 1064 (8th Cir.1982) (citing law re-

view article supporting injunctive relief), *aff'd on reh'g*, 710 F.2d 1361 (1983) (en banc) (McMillan, J., concurring) (suggesting injunctive relief is available). Conversely, most courts have held that the Attorney General may not seek treble damages. *United States v. Bonanno*, 879 F.2d 20, 22–24 (2d Cir.1989). Furthermore, amendments that would have added a private right to injunctive relief were omitted from the final version of the statute. *See Religious Tech. Ctr. v. Wollersheim*, 796 F.2d 1076, 1084–85 (9th Cir. 1986) (discussing RICO's long legislative lineage).

One circuit court, however, has recently held that private parties may obtain injunctive and declaratory relief under RICO. *NOW v. Scheidler*, 267 F.3d 687 (7th Cir.2001), *rev'd on other grounds*, 537 U.S. 393, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003).[8] *Scheidler* relied entirely upon the plain meaning of the statutory text:

"Section 1964(a) ... grants the district courts jurisdiction to hear RICO claims and also sets out general remedies, including injunctive relief, that all plaintiffs authorized to bring suit may seek. Section 1964(b) makes it clear that the statute is to be publicly enforced by the attorney general and it specifies additional remedies, all in the nature of interim relief that the government may seek. Section 1964(c) similarly adds to the scope of 1964(a), but this time for private plaintiffs. Those private plaintiffs who have been injured in their business or property by reason of a RICO violation are given a right to sue for treble damages."

*Id.* at 696. The decision in *NOW v. Scheidler* is most closely on point with the remedies sought in the SAC as *Scheidler*

---

8. The Court notes that the Supreme Court expressly declined to address "whether a private plaintiff in a civil RICO action is entitled

to injunctive relief under 18 U.S.C. § 1964." *Scheidler v. NOW*, 537 U.S. 393, 411, 123 S.Ct. 1057, 154 L.Ed.2d 991 (2003).

arose from the district court's grant of permanent, rather than temporary, injunctive relief, akin to what Plaintiffs are seeking in the case at bar. Furthermore, few courts have squarely addressed the issue of the availability of equitable remedies and even then, do not reason in unison that permanent injunctive relief is unavailable. *See In re Fredeman Litig.*, 843 F.2d 821, 830 (5th Cir.1988) ("[w]e need not decide, however whether all forms of injunctive or other equitable relief are foreclosed to private plaintiffs under RICO"). While the many authorities cited above render this interpretation a close call, the Court will follow the persuasive interpretation of the *NOW v. Scheidler* decision in the Seventh Circuit as it appropriately tracks the plain language of the statute. The Eleventh Circuit has cautioned district courts not to consult legislative history (including failed amendments) when the plain meaning is clear. *CBS Inc. v. PrimeTime 24 Joint Venture*, 245 F.3d 1217, 1225, 1227–28 (11th Cir.2001). Therefore, the Court finds that RICO authorizes the injunctive and declaratory relief that Plaintiffs are seeking.

### 6. MCCARRAN–FERGUSON ACT

 Defendants contend that the McCarran–Ferguson Act, 15 U.S.C. § 1012(b) (the "Act"), bars several named Plaintiffs' claims in Alabama, California, Florida and Louisiana. Section 1012(b) provides that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). The Act was enacted for the express purpose of rendering the antitrust laws inapplicable to insurers who are regulated by the several states, and in particular to allow insurers to form trade associations and share underwriting data.

*Group Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 221–22, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). The Act "reverses the doctrine of preemption in cases involving state insurance law, such that a state law specifically regulating the business of insurance shall preempt a conflicting federal law unless that federal law specifically relates to the business of insurance." *Blackfeet Nat'l Bank v. Nelson*, 171 F.3d 1237, 1243 (11th Cir.1999) (stating that McCarron–Ferguson was passed to "make clear that states generally retained the power to regulate the business of insurance").

 The Eleventh Circuit has directed a three part inquiry for the preemption analysis. First, was the relevant state law enacted "for the purpose of regulating the business of insurance?" Second, is the matter at issue (provider agreements) properly considered the "business of insurance?" Third, does the federal act (the Act) "specifically relate to the business of insurance?" *Id.* at 1240, 1245–46.

 In its previous decisions, the Court has not specifically dealt with the issue of whether the Defendants' challenged activities vis-à-vis the Providers fall under the "business of insurance." The meaning of insurance in this context is a question of federal law. *Blackfeet*, 171 F.3d at 1245; *Royal Drug Co.*, 440 U.S. at 205, 99 S.Ct. 1067; *St. Bernard Hosp. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 618 F.2d 1140 (5th Cir.1980); *Gen. Motors Corp. v. Caldwell*, 647 F.Supp. 585 (N.D.Ga.1986). Some courts have found that similar provider contracts do not constitute the business of insurance. *See Group Life & Health Insurance Co. v. Royal Drug Co.*, 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979); *St. Bernard Hosp. v. Hosp. Serv. Ass'n of New Orleans, Inc.*, 618 F.2d 1140, 1144–45 (5th

Cir.1980), *cert. denied, Hospital Service Association of New Orleans, Inc. v. St. Bernard General Hospital, Inc.,* 466 U.S. 970, 104 S.Ct. 2342, 80 L.Ed.2d 816 (1984)

In *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979), the Supreme Court held that contracts setting the amount of reimbursement health insurance companies would pay to pharmacies providing drugs to insureds were not within the business of insurance. Similarly, in *Union Labor Life Insurance Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), the Court held that a peer review process for determining the reasonableness of health care claims was outside of the business of insurance. Through *Royal Drug* and its progeny, the Supreme Court articulated a three-part test in determining whether a practice falls under the business of insurance: "first, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry." *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 120, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982).

It is unclear whether the provider agreements at issue here constitute the "business of insurance" within the meaning of the Act. *Blackfeet National Bank v. Nelson,* 171 F.3d 1237, 1245 (11th Cir. 1999); *Espinoza v. Union Sec. Life Ins. Co.,* 1996 WL 380702, at *2 (N.D.Ga. Jan. 24, 1996). In the instant case, the provider agreements generally are fee-for-service agreements, which merely minimize the costs Defendants must incur to fulfill their underwriting obligations. *See Liberty Glass Co. v. Allstate Ins. Co.,* 607 F.2d 135, 137 (5th Cir.1979) (finding that service and price agreements between automobile insurers and glass installers for covered automobile glass replacement was not the "business of insurance"). Some lower courts have found that the relationship between insurers and service providers falls outside the "business of insurance." *See, e.g., St. Bernard Hosp.,* 618 F.2d at 1144–45 (contract between mutual insurance association and non-member hospital was not the business of insurance because the purpose of the agreement was to minimize the insurer's costs, rather than to spread risk).

Moreover, the SAC alleges practices which clearly do not deal with the transfer or spreading of a policy-holder's risk. The provider contracts are simply business contracts that allow Defendants to carry out their obligations to their insureds. While some type of provider agreement may be necessary for the Defendants' plans to exist, "it does not follow that because an agreement is necessary to provide insurance, it is also the 'business of insurance.'" *Group Life & Health Insurance Co. v. Royal Drug Co.,* 440 U.S. 205, 214, n. 9, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979). Even though the provider contracts might inure to the benefit of policyholders, they are still not part of the core insurance policy.

Defendants counter that the Court's previous decisions in the subscriber track provide support for their contentions that the claims are created by an underlying insurance policy. *See* SAC ¶ 75 ("These services are provided based upon the fundamental premise that, if the services are covered by Defendants and are medically necessary, the Plaintiffs and class members will be compensated in a timely manner..."). In this case, however, the relationship between the provider and insurance company is an arrangement for the purchase of goods and services. *Roy-*

*al Drug,* 440 U.S. at 214, 99 S.Ct. 1067. Thus, it is distinguishable from the Subscriber Track, where the holders of the insurance policies were pursuing RICO claims.

Defendants also encourage the Court to adopt a more expansive interpretation of the "business of insurance." Citing *United States Dep't of the Treasury v. Fabe,* 508 U.S. 491, 506, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993), the Defendants contend that the reach of the Act is not confined to the business of insurance; rather, the inquiry is focused on whether application of federal law impairs, interferes or conflicts with a State's broad regulatory authority over the business of insurance. *Fabe,* 508 U.S. at 505, 113 S.Ct. 2202. Defendants point to *Fabe's* language which interprets the Act to preclude any suit that seeks to supplant state efforts directly or indirectly "aimed at protecting or regulating" the performance of an insurer's obligations or ensuring that policyholders "ultimately will receive payment." *Id.* at 506, 113 S.Ct. 2202.

Nothing in *Fabe,* however, suggests that the Act sweeps within its scope all laws that affect insurance companies. Indeed, the Supreme Court in *Fabe* supported the interpretation of the "business of insurance" as focusing on the relationship between the insurance company and the policyholder. *See Blackfeet National Bank v. Nelson,* 171 F.3d 1237, 1246 (11th Cir. 1999). Here, Plaintiffs' relationship to the insurer is ancillary to the actual insurance contract itself. *See Royal Drug,* 440 U.S. at 216, 99 S.Ct. 1067. The contracts of insurance were between Defendants and the insureds, not between Defendants and

the individual providers (service agreements). Accordingly, the Court finds that the relationship between insurers and providers falls outside the "business of insurance" and thus the Act does not pose a preemption issue.[9]

### 7. ARBITRABLE PRIMARY RICO CLAIMS

Defendants argue that secondary RICO claims (Counts I and II) that derive from primary RICO claims, 18 U.S.C. § 1962(a) and (c) (Count III), ordered to arbitration or abandoned by Plaintiffs must be dismissed,[10] because Plaintiffs may not recover for secondary violations without first establishing primary RICO violations. The issue presented by Defendants is indeed a novel one. Yet Defendants are unable to cite controlling case law on point that convinces this court to override Plaintiffs' prerogative in framing their claims.

Defendants first submit that Plaintiffs must validly assert a direct RICO claim in order to maintain secondary claims including conspiracy and aiding and abetting. This is not possible, according to Defendants, given the Plaintiffs' abandonment of arbitrable direct RICO claims. It is well established that if a plaintiff fails to state a claim of a primary RICO violation, then the plaintiff's civil conspiracy claims necessarily fails. *See, e.g., GE Invest. Private Placement Partners II v. Parker,* 247 F.3d 543, 551 n. 2 (4th Cir.2001); *Efron v. Embassy Suites, P.R., Inc.,* 223 F.3d 12, 21 (1st Cir.2000); *Discon, Inc. v. NYNEX Corp.,* 93 F.3d 1055, 1064 (2d Cir.1996), vacated on other grounds, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998); *Lightning Lube, Inc.*

---

**9.** Since the claims asserted by the Plaintiffs are outside the business of insurance, the Court does not reach Defendants' specific arguments concerning the insurance laws of four states.

**10.** *See* Order Granting in Part and Denying in Part Various Defendants' Motions to Compel Arbitration at 31 (December 11, 2000).

v. Witco Corp., 4 F.3d 1153, 1191 (3d Cir. 1993); Religious Technology Center v. Wollersheim, 971 F.2d 364, 367 n. 8 (9th Cir.1992); Danielsen v. Burnside–Ott Aviation Training Ctr., Inc., 941 F.2d 1220, 1232 (D.C.Cir.1991); Craighead v. E.F. Hutton & Co., 899 F.2d 485, 495 (6th Cir. 1990); In re Edwards, 872 F.2d 347, 352 (10th Cir.1989).

■■■ Civil conspiracy is not an independent cause of action; it is a liability spreading device based upon a viable underlying cause of action. See United States Steel, LLC v. Tieco, Inc., 261 F.3d 1275, 1294 (11th Cir.2001); Beck v. Prupis, 162 F.3d 1090, 1099 n. 18 (11th Cir.1998), aff'd, 529 U.S. 494, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000) (analyzing whether a RICO conspiracy Plaintiff can recover against a defendant when a co-conspirator commits any overt act in furtherance of the conspiracy, even if the overt act is neither a predicate act of racketeering or an actionable primary RICO violation). Civil (not criminal) common law conspiracy principles have been held to be applicable to secondary RICO claims. Beck, 529 U.S. at 500–01 n. 6, 120 S.Ct. 1608. Similarly, to be guilty of criminal aiding and abetting under 18 U.S.C. § 2, the prosecution must first show that a substantive offense was committed. United States v. Pareja, 876 F.2d 1567, 1568 (11th Cir.1989); see also

United States v. Lozano–Hernandez, 89 F.3d 785, 790 (11th Cir.1996). Civil common law principles of aiding and abetting lead to the same result. Halberstam v. Welch, 705 F.2d 472 (D.C.Cir.1983). Defendants use these preceding principles to argue that Plaintiffs cannot seek secondary liability by proving, without seeking judgment or damages for, primary claims that are subject to arbitration. Further, those direct RICO determinations must be made before an arbitrator.

■■■ Defendants' attempt to piggyback on this line of reasoning is to no avail. Defendants do not cite to any controlling authority that squarely supports their theory.[11] In this case, as they must, Plaintiffs argue that, in the course of asserting their secondary RICO claims, they have pled and intend to prove that each Defendant committed primary RICO violations.[12] Nevertheless, Plaintiffs need not pursue a discrete claim, i.e. seek judgment and damages, for the underlying violation that is the object of the conspiracy or the alleged aiding and abetting violation. Put another way, while it may be necessary for Plaintiffs to plead a violation of the direct RICO statute in order to properly assert the secondary claims, it is not mandatory that they also seek relief for the underlying violation. Adoption of this principle

11. When confronted with the precise issue, the Supreme Court has declined to resolve whether a § 1962(d) RICO conspiracy claim must be predicated on an actionable violation of §§ 1962(a)-(c). Beck, 529 U.S. at 506 n. 10, 120 S.Ct. 1608.

12. Defendants' reliance on McCowan v. Sears, Roebuck & Co., 908 F.2d 1099 (2d Cir.1990) in support of their proposition that 9 U.S.C. § 3 requires a mandatory stay is similarly misplaced as it is factually distinguishable. In McCowan, the plaintiffs sued Sears, with whom they had no arbitration agreement, based upon "controlling person" liability under the Virginia Securities Act for the acts of

Dean Witter, with whom the plaintiffs did possess an arbitration agreement. Id. at 1106. While the Second Circuit reversed the trial court's denial of a mandatory stay under § 3 to Dean Witter, it did not reverse the denial of the stay against the other defendant Sears. Id. at 1107. In fact, the Court declined to pass judgment on the viability or abitrability of Sears' claims. Id. The continuing value of McCowan is also in doubt as it has been implicitly repudiated by later precedent. See Citrus Marketing Board v. J. Lauritzen A/S, 943 F.2d 220, 224–25 (2d Cir.1991). Moreover, this argument invites the Court to disturb previous rulings.

permits Plaintiffs to remain masters of their own complaint. *See Caterpillar, Inc. v. Williams,* 482 U.S. 386, 398–99, 107 S.Ct. 2425, 96 L.Ed.2d 318 (1987). Indeed, the Supreme Court's *Beck* decision confirms that Section 1962(d) can be used to sue a defendant who might not have violated one of the substantive provisions of Section 1962. *Beck,* 529 U.S. at 506–07, 120 S.Ct. 1608. Defendants' theory is therefore a non-starter.

 Close inspection of the substantive principles contained in the secondary causes of action confirms this view. Under common law civil conspiracy law, Plaintiffs need not sue all co-conspirators. *Wilson P. Abraham Constr. Corp. v. Texas Indus., Inc.,* 604 F.2d 897, 904 n. 15 (5th Cir.1979); *Non–Ferrous Metals, Inc. v. Saramar Aluminum Co.,* 25 F.R.D. 102, 104 (N.D.Ohio 1960). Moreover, in aiding and abetting prosecutions, the principal who committed the offense need not be convicted, joined or even identified. *United States v. Campa,* 679 F.2d 1006, 1013 (1st Cir.1982); *United States v. Perry,* 643 F.2d 38, 45 (2d Cir.1981); *United States v. Ruffin,* 613 F.2d 408, 412–13 (2d Cir.1979). Therefore, it would be illogical to preclude Plaintiffs from pursuing secondary RICO claims simply because they are not seeking judgment or relief from the underlying claim. While Defendants contend that there is no meaningful distinction between proving and pursuing a direct RICO violation, nevertheless, the fact remains that Plaintiffs as masters of their complaint still face a hurdle of proving every substantive element of their primary and secondary RICO claims in order to obtain the relief they request.[13]

---

13. Courts have stressed the opposite logic— *i.e.,* requiring Plaintiffs to prove injury from a racketeering act first prevents them from simply alleging a RICO conspiracy and therefore

## B. ERISA PREEMPTION

Defendants renew their reliance on the preemption provision of the Employee Retirement Income Security Act of 1974 ("ERISA") in seeking to dismiss certain claims in the SAC. Defendants contend that the SAC's new set of allegations reveal that Plaintiffs' claims are not only substantially preempted by ERISA's two species of preemption, Section 502 and Section 514, but also to the extent that Plaintiffs seek to pursue their non-participating provider claims through ERISA, those claims must be dismissed for failure to exhaust administrative remedies.

 ERISA applies to any employee benefit plan, provided that it is established or maintained by an employer or employee organization engaged in commerce or in any industry or activity affecting commerce. 29 U.S.C. § 1003(a). The statute explicitly includes plans provided through the purchase of insurance. 29 U.S.C. § 1002(1). Section 514(a), the specific preemption provision, states that this federal statute preempts all state laws insofar as they "relate to" any employee benefit plan. 29 U.S.C. § 1144(a) (1988). A state law "relates to" a covered employee benefit plan "if it has a connection with or reference to such a plan." *District of Columbia v. Greater Washington Bd. of Trade,* 506 U.S. 125, 129, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992) (quoting *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)).

 The Eleventh Circuit has recognized two types of ERISA preemption; complete preemption and defensive, or conflict, preemption. ERISA's specific preemption provision under Section 514

---

evading the other elements of a RICO action. *See Beck v. Prupis,* 162 F.3d 1090 (11th Cir. 1998).

triggers conflict preemption, which applies where the court has subject matter jurisdiction over the case but the plaintiff's claim is subject to ERISA's express preemption provision, 29 U.S.C. § 1144(a) (i.e. if any of plaintiffs' claims "relate to any employment benefit plan"). This "defensive" preemption does not provide independent federal subject matter jurisdiction. Rather, it provides an affirmative defense to state law claims. *See Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207, 1211 (11th Cir.1999).

This Court has had occasion to consider the issue of ERISA preemption in a prior iteration of Plaintiffs' complaint and previously found that Plaintiff providers in the *Shane* consolidated provider-track action could "bring their breach of contract claims free of the shadow of ERISA preemption." *In re Managed Care Litigation,* 135 F.Supp.2d 1253, 1268 (S.D.Fla. 2001); *see also Cutler v. Humana Health Plan, Inc.* No. 00–630, slip. op. at 1–2 (S.D.Fla. Mar. 7, 2001) (finding no ERISA preemption based upon provider's breach of contract and violations of Florida statutory law claims), *Blackshear v. United Health Care of Florida, Inc.;* No. 00–1334, slip. op. at 2 (S.D.Fla. May 4, 2001) (same).[14] The analysis previously performed by the Court, however, was in accordance with Section 514(a). This Court reasoned that "state law claims brought by health care providers too tenuously affect ERISA plans to be preempted by the Act." *See In re Managed Care Litig.,* 135 F.Supp.2d at 1268 (citing *Lordmann En-*

*terprises, Inc. v. Equicor, Inc.,* 32 F.3d 1529, 1533 (11th Cir.1994)). Furthermore, the Court found that Plaintiffs' claims that Defendants breached their contracts by bundling and downcoding did not require plan interpretation so as to "relate to" any ERISA plan. *See id.* at 1268.

 On the other hand, there is another type of preemption provided by Section 502(a) of ERISA's statutory scheme, which Defendants urge the Court to apply to a substantial number of claims in the most recent complaint. This complete preemption, or "super-preemption," arises from Congress's creation of a comprehensive remedial scheme in 29 U.S.C. § 1132 for loss or denial of employee benefits. *See Butero v. Royal Maccabees Life Insurance Co.,* 174 F.3d 1207 (11th Cir. 1999). Complete preemption applies where "Congress preempts an area of law so completely that any complaint raising claims in that area is necessarily federal in character and therefore necessarily presents a basis for federal jurisdiction." *Kemp v. Int'l Bus. Mach. Corp.,* 109 F.3d 708, 712 (11th Cir.1997). This doctrine serves as an exception to the "well-pleaded complaint rule" and even permits a defendant to remove a case to federal court even when only state law claims are alleged in the complaint. *Id.* Congress has established complete preemption in the realm of ERISA under Section 502(a), which provides that ERISA is the exclusive cause of action for the recovery of benefits under an ERISA plan. 29 U.S.C.

---

14. Other courts have also followed this line of analysis. *See, e.g. Blue Cross of California v. Anesthesia Care Associates Medical Group, Inc.,* 187 F.3d 1045 (9th Cir.1999) (holding that "Providers' claims, which arise from the terms of their provider agreements and could not be asserted by their patient-assignors, are not claims for benefits under the terms of ERISA plans...''); *Lakeland Anesthesia, Inc. v. Louisiana Health Service & Indemnity Co.,*

2000 WL 1801834 (E.D.La. Dec. 6, 2000) (holding that ERISA preemption is not triggered where the plaintiff health care providers sought to enforce contractual rights under provider agreements); *Riverhills Healthcare, Inc. v. Aetna U.S. Healthcare, Inc., et al,* 2000 U.S. Dist. LEXIS 19313 (S.D.Ohio. Oct. 23, 2000) (granting motion to remand where providers sued HMOs for breach of contract of provider agreement).

§ 1132(a); *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 65–67, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987). Therefore, put more succinctly, if a state law claim is in fact properly one that arises under ERISA's enforcement provisions, *e.g.* a claim for benefits, ERISA complete preemption should apply.[15] *Id.* The Court will accordingly bifurcate its discussion of ERISA preemption.

### 1. SECTION 502 PREEMPTION

**a. Express Contract Claims (Count V)**

▆▆ Defendants assert that the Provider Plaintiffs' breach of contract claims are subject to complete preemption under Section 502(a) because they are attempting to assert an alternative basis, outside of ERISA, for enforcing plan obligations to pay for covered, medically necessary services. Confronted with this Court's clear precedent of holding that ERISA preemption is inapplicable to the Plaintiffs' state law contract claims, Defendants claim that regardless of whether there was ordinary preemption under Section 514(a), ERISA nonetheless preempts all the state law contract claims, whether or not they relate to an ERISA plan, because Plaintiffs seek to impose an alternative enforcement mechanism for benefits that are created by ERISA plans. Specifically, Defendants argue that under *Rush Prudential v. Moran*, 536 U.S. 355, 122 S.Ct. 2151, 153 L.Ed.2d 375 (2002), the Supreme Court made stark the applicability of Section 502(a) to this context.

At the outset, the Court notes that Section 502(a)(1)(B) provides that an ERISA plan "participant or beneficiary" may bring a civil action "to recover benefits due to

him under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Defendants argue that Plaintiffs' claims are substantially preempted by Section 502(a) of ERISA because Plaintiffs now concede that Defendants are liable under their state-law theories only for "medically necessary" services that are "covered" for Defendants' insureds. SAC ¶ 76. Therefore, Defendants argue that the great bulk of plaintiffs' state-law claims, if permitted to go forward, would plainly constitute the type of alternative enforcement mechanisms that are squarely foreclosed by ERISA's "carefully integrated" civil enforcement provisions. *See Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).

▆▆ Defendants, however, misconstrue the scope of preemption under Section 502(a). While Defendants read Section 502(a) to encompass a much broader area of preemption, by its very terms, Section 502(a) provides for preemption only in suits for benefits among ERISA entities. *See id.* at 54, 107 S.Ct. 1549 ("the policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if *ERISA-plan participants and beneficiaries* were free to obtain remedies under state law that Congress rejected in ERISA") (emphasis added). This dispute, therefore, boils down to whether the Provider Plaintiffs are considered "ERISA entities" who have standing to pursue an ERISA claim for benefits. The only parties that have standing to sue under ERISA are those listed in the civil

---

**15.** In order for state law claims to be subject to ERISA complete preemption, four elements must be present: (1) a relevant ERISA "plan"; (2) the plaintiff must have standing to sue; (3) the defendant must be an ERISA entity; and (4) the complaint must seek relief akin to what is available under 29 U.S.C. § 1132(a). *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1212 (11th Cir.1999).

enforcement provision of ERISA, codified at 29 U.S.C. § 1132(a).[16] Under 29 U.S.C. § 1132(a)(1)(B), a plaintiff must be either a "participant" or a "beneficiary" of the ERISA plan in order to have standing. *See Hobbs v. Blue Cross Blue Shield of Ala.*, 276 F.3d 1236, 1241 (11th Cir.2001). To be a "participant," one must be an "employee or former employee of an employer, or any member or former member of an employee organization." 29 U.S.C. § 1002(7). A "beneficiary" is "a person designated by a participant or by the terms of an employment benefit plan, who is or may become entitled to a benefit thereunder." *Id.* at § 1002(8). Therefore, only two categories of individuals are permitted to sue for benefits under an ERISA plan—plan beneficiaries and plan participants. *Engelhardt v. Paul Revere Life Ins. Co.*, 139 F.3d 1346, 1351 (11th Cir. 1998).

█ Generally, health care providers such as the Provider Plaintiffs lack independent standing under ERISA's statutory scheme because they are not ordinarily considered "beneficiaries" or "participants." *See Cagle v. Bruner*, 112 F.3d 1510, 1514 (11th Cir.1997). However, when they receive assignments of benefits from beneficiaries or participants of an ERISA plan, they can acquire derivative standing. *Id.* Therefore, whether complete preemption applies is largely a function of whether an existing assignment entitles the provider to have standing under ERISA, or whether the provider can 'step into the shoes' of a participant or beneficiary.

Here, there can be no doubt that Plaintiffs with express fee-for-service contracts are not ERISA beneficiaries because they are suing under the terms of their independent contracts with Defendants. Since Section 502(a) is meant to remedy the denial of ERISA benefits, it logically follows that doctors, who are not among the persons or entities entitled to bring an ERISA claim under Section 502(a), cannot be affected by this species of ERISA's preemptive force if they are merely filing suit for payment under the terms of their independent contracts. Accordingly, the Court finds that the Plaintiffs' breach of contract claims continue to remain outside of the shadow of ERISA preemption.

**b. Constructive Contract Claims(Non–Participating Providers)(Count VI)**

█ The issue of the non-participating providers gives the Court some pause. By definition, the non-participating providers lack an express contractual relationship with Defendants. Nevertheless, on the face of the SAC, there are at least two distinct sub-classes of non-participating providers lacking a contractual relationship: those with assignments from participants or beneficiaries ("Provider–Assignees") and those without them.

**16.** The civil enforcement provisions state in pertinent part:

> A civil action may be brought -
> (1) by a participant or beneficiary
> (A)for the relief provided for in subsection (c) of this section, or
> (B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

> (2) by the Secretary, or by a participant, beneficiary, or fiduciary for appropriate relief under section 1109 of this title;
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of this plan.
> 29 U.S.C. § 1132(a).

Defendants contend that the Provider–Assignees' constructive contract claims are subject to complete preemption under Section 502(a) of ERISA because whatever their characterization, they are in reality claims for ERISA plan benefits made by doctors rendered outside of a contractual relationship with the insurer. Defendants claim these claims can only be brought on the basis of an assignment of the patient's rights.

 Section 502(a)(1)(B) provides that an ERISA plan "participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). As discussed *supra*, ERISA complete preemption exists only when the "plaintiff is seeking relief that is available under 29 U.S.C. § 1132(a)." *Butero v. Royal Maccabees Life Ins. Co.*, 174 F.3d 1207, 1212 (11th Cir.1999) (*quoting Whitt v. Sherman Int'l Corp.*, 147 F.3d 1325, 1330 (11th Cir.1998)). In order for state law claims to be subject to ERISA complete preemption, four elements must be present: (1) a relevant ERISA "plan"; (2) the plaintiff must have standing to sue; (3) the defendant must be an ERISA entity; and (4) the complaint must seek relief akin to what is available under 29 U.S.C. § 1132(a). *Butero*, 174 F.3d at 1212.

In the instant case, the first and third elements are undisputedly met. Therefore to determine whether the Provider–Assignees are in reality seeking relief under Section 502(a), the Court must decide first, whether they are indeed participants or beneficiaries in order to have standing under ERISA, and second, whether they are attempting to recover benefits due to them under the terms of an ERISA plan.

Since the Provider–Assignees possess assignments from plan beneficiaries, they clearly possess derivative standing under controlling Eleventh Circuit precedent. In *Cagle v. Bruner*, 112 F.3d 1510 (11th Cir. 1997), *reh'g en banc denied*, 124 F.3d 223 (11th Cir.1997), the Eleventh Circuit held that a healthcare provider had derivative standing to bring an action against an ERISA plan insurance fund where the record showed that the provider had been assigned the right to payment of medical benefits. *See Cagle*, 112 F.3d at 1512–13 (patient's father signed form assigning to hospital right to payment of dependent son's medical benefits under ERISA-governed plan); *see also HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.*, 240 F.3d 982, 985, 991 (11th Cir.2001) (patient assignment to hospital the rights to recover 80% of the costs of surgery from the insurance company)

As to the fourth element of complete preemption, Defendants maintain that it is beyond dispute that Provider–Assignees are attempting to collect unpaid benefits due under a plan because there is no independent contract that entitles them to payment for services. The Court agrees. In possessing an assignment, the provider-assignees hold the right to collect such unpaid benefits. Virtually every court to consider this question has held that reimbursement and related claims involving services provided to ERISA beneficiaries on a non-participating basis may be pursued only through ERISA's civil enforcement provision. *See, e.g., Hermann Hosp. v. MEBA Med. & Benefits Plan*, 845 F.2d 1286, 1290 (5th Cir.1988) (holding non-participating provider's state-law claims for breach of fiduciary duty, breach of contract, negligence, equitable estoppel, and fraud preempted, and limiting provider to ERISA remedy); *Charter Fairmount Inst., Inc. v. Alta Health Strategies*, 835 F.Supp. 233, 239–40 (E.D.Pa.1993) (holding non-participating provider's state law

claims for estoppel, misrepresentation, and negligent misrepresentation preempted, and limiting provider to ERISA); *See also Cagle v. Bruner,* 112 F.3d 1510, 1515 (11th Cir.1997) (it is the assignment by a physician of the right to be "paid for [the assignor-patient's bills]" that triggers the providers' assignee-standing under ERISA Section 502(a)). Moreover, "[r]egardless of the merits of the Plaintiff's actual claims (recast as ERISA claims), relief is available, and there is complete preemption when the four elements are satisfied." *Butero v. Royal Maccabees Life Ins. Co.,* 174 F.3d 1207, 1212 (11th Cir.1999).

The Court consequently finds that Provider–Assignees possess derivative standing and thus all of their claims—including those for constructive contract—are recast under the doctrine of complete preemption as ERISA claims for benefits under Section 502(a). Accordingly, this statute constitutes their exclusive avenue for enforcing claims for ERISA benefits. 29 U.S.C. § 1132(a)(1)(B).[17] A caveat is in order, however. This finding is contingent upon production of valid subscriber assignments from the Provider–Assignee subclass. To the extent that Defendants are not able to produce proof of a valid assignment from patients, the derivative standing doctrine does not apply to those providers. *Hobbs v. Blue Cross Blue Shield of Ala.,* 276 F.3d 1236, 1242 (11th Cir.2001).

### 2. SECTION 514 PREEMPTION

#### a. Express Contract and Constructive Contract Claims

 Although this Court previously held that Plaintiffs might pursue certain

breach of contract claims notwithstanding ERISA, Defendants maintain that the new allegations in the SAC reveal that the issue of ERISA Section 514(a) preemption must be revisited. Under the new allegations, Defendants claim that Plaintiffs have conceded in the SAC that doctors are to be paid for "covered, medically necessary services." Defendants assert that this Court's previous opinion stressed that Plaintiffs' claims—as they were then pleaded—"might sustain a breach of contract claim without a need for reference to the interpretation of ERISA plans." *In Re Managed Care Litig.,* 135 F.Supp.2d at 1268. Since the complaint purports to seek payments for "covered" procedures, this is necessarily a term that will require interpretation of "insured's plans and policies"—as Plaintiffs' own complaint concedes. SAC ¶ 77. Therefore, Defendants argue that applying the reasoning of this Court's previous decision, the allegations of the new complaint therefore require reference to a plan.

Plaintiffs contend that the Court's earlier decision, discussed *supra,* still controls the outcome here and Defendants's arguments are largely semantic in nature. The Court agrees and sees no reason to depart from its previous ruling. The Provider Plaintiffs' state law claims are still for payment for services rendered, not for ERISA benefits. Moreover, Plaintiffs contend, correctly, that Defendants' attempt at linking the issue of plan interpretation to their allegations that the services are "covered" does not trigger ERISA preemption because the Defendants have already determined that these claims are

---

**17.** Defendants do not expressly argue that claims brought by non-participating providers who do not hold assignments are completely preempted by Section 502(a). *See* Def. Reply at 37 n. 10. Nevertheless, without an assignment, the non-participating provider lacks standing under Section 502(a) and complete preemption is inapplicable. *See Sanson v. General Motors Corporation,* 966 F.2d 618 (11th Cir.1992) ("only a participant or beneficiary can file a civil action under ERISA").

covered. *See* SAC ¶ 205. The dispute in this case centers on whether Defendants have the right to deny full and complete payment to doctors based upon facts that do not relate to issues of coverage, for example, bundling and downcoding. *See* SAC ¶ 84. Therefore, what is at issue is the amount of payment, not whether a right to payment exists. *See Blue Cross of California v. Anesthesia Care Assoc. Medical Group, Inc.*, 187 F.3d 1045 (9th Cir. 1999); *Medical and Chirurgical Faculty of the State of Maryland v. Aetna U.S. Healthcare*, 221 F.Supp.2d 618, 621 (D.Md. 2002) (finding that HMO plan documents did not need to be interpreted in dispute over services provided by Providers). Accordingly, the breach of contract claims continue not to "relate to" the administration of an ERISA plan.

### i. Non–Participating, Non–Assignee Providers

■ As a subsidiary issue, Defendants contend that the constructive contract claims brought by non-participating Providers who lack assignments ("Non–Par Providers") must be preempted under Section 514(a) because they are essentially promises to pay benefits embodied in the patients' ERISA plans. Defendants argue that these claims necessarily "relate to" employee benefit plans. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 657–58, 662–63, 115 S.Ct. 1671, 131 L.Ed.2d 695 (1995).

Plaintiffs assert that the preemption analysis for the constructive contract claims is no different than an express contract claim, since these continue to be claims by health care providers against plan insurers brought by independent third parties that do not require plan interpretation and promote the goals of ERISA. *See In re Managed Care Litig.*, 135 F.Supp.2d at 1268. Plaintiffs maintain that the Non–Par Providers can bring their own direct claims for payment, and therefore, these claims escape ERISA preemption because they are not based upon "the relationship between the insured and insurer, but upon Defendants' solicitation and knowing acceptance of their services." SAC ¶¶ 210–214.

The Non–Par Providers are independent third parties whose claims have accrued based on their status as a non-contracted health provider and not accrued upon an entitlement to benefits arising through an assignment of such benefits by patients treated by Plaintiff. Further, their constructive contract and unjust enrichment claims are not based upon the "relationship between the insured and insurer" but upon Defendants' solicitation and knowing acceptance of the Providers' services. SAC ¶¶ 210–214. Moreover, Defendants are alleged to engage in denying, diminishing, and delaying payments for these services. SAC ¶ 212.

While it is possible that some of the Non–Par Providers may obtain assignments, that fact alone does not force them to pursue the ERISA claims route instead of bringing claims against Defendants in their own independent right. In *Lordmann v. Equicor*, 32 F.3d 1529 (11th Cir. 1994), the Eleventh Circuit did not preclude the provider plaintiff's secondary claims of fraudulent misrepresentation, even when the Plaintiff had asserted two claims as an assignee. Moreover, other courts in this District have allowed a claim for promissory estoppel to go forward even with the presence of an assignment of plan benefits. *See, e.g., Variety Children's Hospital, Inc. v. Blue Cross/Blue Shield of Florida*, 942 F.Supp. 562, 568 (S.D.Fla. 1996). Therefore, Plaintiffs need not necessarily be channeled into the ERISA statutory scheme when simultaneously bringing direct claims in their own right.

Given the similarity of the allegations to ones previously considered, the Court applies its prior ruling declining to extend the preemptive reach of ERISA to the claims of third-party-providers to the current subclass of non-participating providers who do not hold assignments. The claims made by these providers are not issues relating to the relationship between a beneficiary patient and the plan administrator; rather, they give rise to a separate relationship between the provider and plan administrator. Therefore, these claims fit logically within the framework set out by this Court's previous decision.

### b. Prompt Pay Claims (Count VII)

 Defendants contend that all the "prompt pay claims based upon statutory rights of action are preempted by ERISA." They assert that courts which have analyzed either the prompt pay statutes on which Plaintiffs rely or substantially similar statutes have concluded uniformly that claims under these provisions "relate to" ERISA plans and therefore are preempted under both Section 502(a) and Section 514(a), *See, e.g. Cramer v. Association Life Ins. Co.*, 569 So.2d 533, 536 (La. 1990) (explaining that "[t]he basis for the plaintiff's suit is the defendant-insurer's allegedly arbitrary and capricious failure to pay benefits under an employee benefit plan."); *Biondo v. Life Ins. Co. of North America*, 116 F.Supp.2d 872 (E.D.Mich. 2000). Indeed, the Complaint alleges that all the "prompt-pay" plaintiffs may be asserting claims as the assignees of the patients' rights. SAC ¶ 221. These cases, of course, are not binding on this Court.

 The Court finds that in line with its prior analysis the Providers are bringing their prompt pay claims in their provider capacities, rather than as assignees of plan benefits, the prompt pay claims are not preempted by ERISA § 514. Moreover, to the extent that prompt pay claims must be brought on the basis of patient assignments, they are brought under Section 502(a) of ERISA. SAC ¶¶ 221, 222.

### c. Unfair Trade Practice Claims (Counts VIII and X)

 The Provider Plaintiffs assert that their unfair trade practice claims are not preempted by ERISA because there are brought by health care providers against insurers in their own right rather than as assignees. Defendants contend that these type of claims are precisely the sort of state law claims which ERISA preempts. *See Anderson v. Humana, Inc.*, 24 F.3d 889 (7th Cir.1994); *Sanson v. General Motors Corp.*, 966 F.2d 618 (11th Cir.1992). The cases cited by Defendants are distinguishable, however, as they were brought by plan participants for either fraud or statutory unfair trade practices in connection with the administration of ERISA plan benefits. Here, as it is providers, not subscribers, bringing the claim, the result does not hold. Moreover, the relationship between ERISA plans and their beneficiaries is not affected; these unfair trade claims arise out of the relationship between the providers and the Defendants. Therefore, the unfair trade practice claims also continue to escape the shadow of ERISA preemption.

### 3. EXHAUSTION OF REMEDIES

 Defendants argue that to the extent that Plaintiffs seek to pursue their Non–Participating Provider claims through the exclusive ERISA remedy, these claims must be dismissed for failure to exhaust administrative remedies. Therefore, Plaintiffs' claims regarding non-participating providers who bring ERISA claims must be dismissed with leave to refile after exhaustion of administrative remedies.

It is well-established that plaintiffs must normally exhaust available administrative remedies under their ERISA-governed plans before they bring suit in federal court. *Springer v. Wal–Mart Assocs.' Group Health Plan*, 908 F.2d 897, 899 (11th Cir.1990); *Perrino v. Southern Bell Tel. & Telegraph Co.*, 209 F.3d 1309, 1315 (11th Cir.2000). This requirement applies to actions in which the plaintiff sues individually as well as actions where the plaintiff sues as a representative of a putative class. *See Perrino*, 209 F.3d at 1315 (applying exhaustion requirement to a class action). Moreover, this requirement applies to actions in which a plaintiff sues as an assignee of a participant's claim. *See, e.g., Variety Children's Hosp. v. Century Health Med. Plan, Inc.*, 57 F.3d 1040, 1042 (11th Cir.1995).

This Court must "apply the exhaustion requirement strictly" and "recognize narrow exceptions only based on exceptional circumstances." *Perrino*, 209 F.3d at 1318. Exhaustion of administrative remedies is not required when it would be futile, the administrative remedy is inadequate, or meaningful access to administrative review is denied. *Id.* at 1316–1318. Defendants argue that Plaintiff's allegations targeted to trigger one of the three limited exceptions are conclusory and made without any factual basis. The Court agrees. First, Plaintiffs allege that resort to administrative review would be futile because there is "no honest dispute over services rendered" since there is a "long-standing, integrated, automated and intentional scheme to deprive doctors of payment." SAC ¶ 223. Yet, simple allegations of fraudulent conduct are not enough to invoke this exception. The Eleventh Circuit has never held that mere allegations of a "fraudulent" scheme are sufficient to excuse the exhaustion requirement. *See Mason v. Continental Group,*

*Inc.*, 763 F.2d 1219, 1224 (11th Cir.1985), *cert. denied*, 474 U.S. 1087, 106 S.Ct. 863, 88 L.Ed.2d 902 (1986) ("simply characterizing the claim as a tort claim rather than a breach of contract claim does not excuse the failure to pursue [administrative] remedies"). This Court previously noted that crediting such allegations "would apparently excuse any ERISA plaintiff who alleges malfeasance by a defendant." *In re Managed Care Litig.*, 185 F.Supp.2d 1310, 1333 (S.D.Fla.2002). In fact, there are no allegations in the SAC maintaining that Plaintiffs' actual *efforts* at obtaining administrative review have been somehow blocked or impeded by Defendants.

Second, Plaintiffs maintain that administrative remedies are inadequate because this is not a case involving claims by plan participants focused on their own care; rather, these claims are asserted by "busy doctors who are being nickelled (sic) and dimed to death on requests for payment that, on an individual basis, are just not worth pursuing." Pl.'s Opp'n Br. at 45. Plaintiffs provide no basis in fact, however, for their allegation that the administrative remedies are inadequate because they are neither practical nor effective. Plaintiffs "do not plead the nonexistence of administrative review for a denial of benefits." *In re Managed Care Litig.*, 185 F.Supp.2d 1310, 1332 (S.D.Fla.2002). Nor do Plaintiffs plead that existing remedies would be insufficient. *See Amato v. Bernard*, 618 F.2d 559, 568 (9th Cir.1980). Indeed, Plaintiffs have not alleged any attempt to pursue the relevant administrative remedies. *See Perrino*, 209 F.3d at 1319 ("This case might be different if Appellants actually had resorted to the grievance and arbitration procedure" only to be told that relief would not be made available. "However, none of the Appellants even pursued the grievance and arbitration procedure available."). At bottom, this is an argument that the administrative procedures

are effectively too much of a hassle to merit the Plaintiffs' trouble, and this, with no allegations that the plan procedures provide no remedy, is insufficient for a successful invocation of the exception.[18]

Finally, Plaintiffs claim that any meaningful or timely access to administrative review is alleged to have been blocked by "misleading coded explanations and by refus[als] to disclose claims processing techniques." SAC ¶¶ 98, 99. Again, Plaintiffs fail to specify any attempts to conduct a good faith inquiry into the applicability of these administrative proceedings. *In re Managed Care Litig.*, 185 F.Supp.2d 1310, 1332 (S.D.Fla.2002). Moreover, they do not allege any failure to receive plan documents outlining the availability of administrative procedures. Indeed, in a previous order in the subscriber track, this Court refused to allow similar allegations of a denial of notice due to Defendants' fraudulent policies to constitute a denial of meaningful access to the administrative review scheme. *Id.* Moreover, adequacy will generally be an issue when administrative review procedures are non-existent or the existing remedies would not provide a claimant all the relief he is entitled to under a plan. *See id.*

Accordingly, because Plaintiffs have failed to sufficiently plead an exception to the exhaustion requirement, the ERISA claims brought by Providers are DISMISSED with leave to re-file.

## C. CHOICE OF LAW

Defendants assert that Plaintiffs are limited to invoking only the regulatory statutes of those States in which they reside or treat patients, on the basis of their contracts with the local subsidiaries of defendants with whom plaintiffs have dealt. In short, Defendants argue that Plaintiffs' state law claims under out-of-state statutory schemes must be dismissed.

█ The Commerce Clause and Due Process Clauses limit the ability of each state to apply its own laws and policies to conduct occurring beyond its borders. *BMW of N. Am. v. Gore*, 517 U.S. 559, 572, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). A state's laws are "presumptively territorial and confined to limits over which the law-making power has jurisdiction." *Sandberg v. McDonald*, 248 U.S. 185, 195, 39 S.Ct. 84, 63 L.Ed. 200 (1918). None of the state statutes invoked by Plaintiffs expressly apply beyond the borders of the states that enacted them. These are fundamental substantive limits on the scope of state regulatory jurisdiction—limits that the procedural vehicle of a class action cannot justify transgressing. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 288 F.3d 1012, 1018 (7th Cir.2002). In cases transferred pursuant to 28 U.S.C. § 1407, the transferee district court must apply the state law, including its choice of law rules, that would have been applied had there been no change of venue. *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964); *see also Ferens v. John Deere Co.*, 494 U.S. 516, 525–26, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990); *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 97

---

18. While similar allegations regarding the costs of pursuing individual claims far exceeding their actual value were countenanced in this Court's Order Certifying the Provider Track Class, the inquiry for ERISA exhaustion requirements is distinguishable from concerns that underpin Fed R. Civ. P. 23(a).

ERISA's statutory scheme strongly favors plan review procedures in order to minimize the cost of dispute resolution and prevent premature judicial intervention in the decision making process. *Mason v. Continental Group, Inc.*, 763 F.2d 1219, 1227 (11th Cir. 1985).

F.3d 1050, 1055 (8th Cir.1996). Federal courts sitting in diversity must apply state choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496–97, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Baltimore Orioles, Inc. v. Major League Baseball Players Ass'n,* 805 F.2d 663, 681 (7th Cir.1986) (holding that *Klaxon* applies to determine law governing pendant state claims).

 The Main Track Plaintiffs practice medicine—and are presumably licensed to practice medicine—in only seven states: Alabama, California, Colorado, Florida, Georgia, Kentucky and Texas. SAC ¶¶ 11–29. The SAC is a composite of actions originally commenced in multiple jurisdictions including Kentucky (*Shane*), California (*Klay* and *CMA*), Alabama (*Mangieri*) and Georgia (*Harrison*). For each Plaintiff the controlling law is that of the state where the Plaintiff resides (or practices medicine) and where his dealings with Defendants' corporate subsidiaries occurred and his alleged injuries were sustained. *Henderson v. Superior Ct.,* 77 Cal. App.3d 583, 592–93, 142 Cal.Rptr. 478 (1978) (most significant relationship); *Morris v. SSE, Inc.,* 912 F.2d 1392, 1394 (11th Cir.1990) (Alabama applies lex loci contractus); *Fitts v. Minn. Mining & Mfg. Co.,* 581 So.2d 819, 820–23 (Ala.1991) (lex loci delicti); *Int'l Bus. Machs. Corp. v. Kemp,* 244 Ga.App. 638, 536 S.E.2d 303, 306–07 (2000) (lex loci contractus & lex loci delicti); *Sec. Ins. Co. v. Kevin Tucker & Assocs.,* 64 F.3d 1001, 1005–06 (6th Cir. 1995) (most significant relationship); *Breeding v. Mass. Indem. & Life Ins. Co.,* 633 S.W.2d 717, 719 (Ky.1982); *Rayle Tech., Inc. v. DEKALB Swine Breeders, Inc.,* 897 F.Supp. 1472, 1476 (S.D.Ga.1995); *IBM v. Kemp,* 244 Ga.App. 638, 536 S.E.2d

303, 306–07 (2000); *Ex Parte Exxon Corp.,* 725 So.2d 930, 932 (Ala.1998). Contract rules also should apply to quantum meruit and violation of prompt pay and consumer protection statutes, absent choice of law provisions in the relevant contracts.

The Court finds that the Connecticut Unfair Trade Practices Act, the New Jersey Consumer Fraud Act and the various prompt pay statutes of applicable states can have no application to Plaintiffs that neither reside, treat patients nor have engaged in a relevant transaction in that particular State. Nevertheless, while no named Plaintiff resides or practices medicine in either Connecticut or New Jersey, members of the class presumably do reside in all fifty states. The Court will revisit this issue further along the proceedings, as this ruling will become more applicable at the summary judgment stage when Plaintiffs' claims will be fully fleshed out.

## D. STATE COMMON LAW CLAIMS

### 1. QUASI–CONTRACT CLAIMS (COUNT VI)

Defendants contend that Plaintiffs may not simultaneously pursue contract and quasi-contract claims because under any applicable state law, a contracting party cannot assert quasi-contract claims.[19] Therefore, they argue Count VI fails to state a claim for relief because claims for unjust enrichment and breach of constructive contract will not lie in the face of an express contract. Further, states in which the Providers reside uniformly bar suits that maintain quasi-contractual theories, such as quantum meruit, in the face of an express contract between the parties. *See, e.g. Harris v. Schickedanz Bros.-Riviera Ltd.,* 746 So.2d 1152, 1154 (Fla. 4th DCA

19. Plaintiffs asserting simultaneous contractual and quasi-contractual claims include plaintiffs Backer, Book, Boxstein, Burgess, Davis, Harrison, Molk, Moran, Porth, Shane, A. Taleisnik, and J. Taleisnik.

1999). The Defendants also point out that the benefit is actually conferred upon the patient—the recipient of the health care— and not the HMO because HMOs have no duty or obligation to provide treatment to members of its health plans. Rather, their only obligation is to reimburse their insureds for expenses incurred if, and only to the extent, those expenses are covered in accordance with the terms of the patient's health plan.

 Plaintiffs do not dispute the principle, but maintain that it does not apply to their Count VI claims. (Plaintiffs concede that a Count VI claim cannot be asserted against Anthem. Pl. Opp. at 51 n. 18). Plaintiffs maintain that while all of the Count VI Plaintiffs, with the exception of Dr. Mangieri, have contracts with one or more of the Defendants, they also have treated the insureds of one or more of the Defendants *outside* of any contractual relationship. SAC ¶¶ 11–13, 16, 18, 22, 27– 29. Therefore, Plaintiffs are not asserting quasi-contractual theories for treatments of insured under express contracts. Given the complexity of relationships alleged in the SAC, this issue is essentially one of characterization. As a matter of law, however, the Court finds that Plaintiffs may not assert constructive contract claims against a Defendant where the Provider is also bringing a claim for breach of contract against the same Defendant.

 In its separate brief, Coventry also asserts that neither of the quasi-contractual claims are stated because the benefit received when Providers, such as Dr. Backer, treated patients, they were obli-

gated to provide treatment, and thus, these are not the kind of direct benefits required to support a claim. It is merely incidental or indirect. Plaintiffs contend, correctly, however, that satisfaction of an obligation will support a claim for unjust enrichment. *Restatement of the Law of Restitution, § I; Wolf v. National Council of Young Israel,* 264 A.D.2d 416, 694 N.Y.S.2d 424, 425–26 (2d Dep't 1999) (plaintiff whose funds were used to satisfy the obligation of defendants had claim for unjust enrichment). Therefore, Coventry's argument must be rejected.

## E. STATE STATUTORY CLAIMS [20]

### 1. PROMPT PAY: PRIVATE RIGHT OF ACTION

 Count VII asserts claims based upon the prompt pay statutes of 32 states. As a preliminary matter. Defendants concede that five states give those classes of individuals referenced in the particular statutes an express right of action (Alabama, Mississippi, Texas, Nevada and Virginia) [21] and that in four others a private right of action for certain classes exists by implication (Oklahoma, Maine, Massachusetts, New Hampshire). These unilateral concessions leaves 22 states in dispute where Plaintiffs claim that a private right of action exists.

 ■ Whether a private action can be implied from a statute depends upon legislative intent. *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 18, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Cannon v. Univ. of Chic.,* 441 U.S. 677, 694, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979);

---

**20.** It is unnecessary to analyze the Connecticut Unfair Trade Practices Act, because the only applicable Defendant is AETNA. *See* Order Denying Without Prejudice Certain Motions Filed by Defendants AETNA, Inc. and AETNA–U.S. Healthcare, Inc., dated *June 4, 2003.*

**21.** Ala.Code § 27–1–19; Miss.Code Ann. § 83–9–5; Tex. Ins.Code Ann. § 20A.18B; Nev.Rev.Stat. Ann. §§ 689A.410, 689B.255 and 696C.185; and Va.Code Ann. § 38.2– 3407.15.

*Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). The Court analyzes any explicit or implicit indication of legislative intent either to create such a remedy or deny one, and whether such an implication is consistent with the underlying purposes of the legislative scheme. Where a legislature expressly provides a means for enforcing compliance with a particular statute, it is unlikely that it forgot to mention an intended private right. *Transamerica,* 444 U.S. at 20, 100 S.Ct. 242; *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 14, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Ayres v. Gen. Motors Corp.,* 234 F.3d 514, 522–23 (11th Cir.2000); *Farlow v. Union Cen. Life Ins. Co.,* 874 F.2d 791, 795 (11th Cir.1989) ("Federal courts should be reluctant to read private rights of action into state laws where state courts and state legislatures have not done so. Without clear and specific evidence of legislative intent, the creation of a private right of action by a federal court abrogates both the prerogatives of the political branches and the obvious authority of states to sculpt the contents of state law."). However, a legislature's enactment of regulatory standards and a corollary scheme of administrative enforcement does not alone demonstrate intent to afford parallel private remedies. *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001). In litigating whether the prompt pay statutes afford private remedial rights, the parties have included appendixes which exhaustively outlined a state-by-state analysis.

Plaintiffs assert that each legislature must have implicitly intended to allow private rights of action in enacting prompt pay statutes. Pointing to the text of the prompt pay statutes, the Plaintiffs contend that while each statute was enacted to address payment disputes by insurer, they contain no specific mechanism—either by those effected or by insurance commissioners—to recover unpaid interest, which is the express remedy provided for violations. Plaintiffs argue that no rational legislature would expect state insurance commissioners to have the time, resources or inclination to take legal action to recover interest for individual providers and that state insurance commissioners are supposed to correct more widespread abuses. Plaintiffs also note that no state prompt pay statute expressly denies a private right of action and that no state provides an exclusive administrative enforcement scheme that applies only to claims under the prompt pay statutes.

Nevertheless, the Court cannot countenance flimsy evidence of intent premised on what is at best, seemingly logical assumptions. The Plaintiffs have conceded that when identifying private rights of action, legislative intent remains the touchstone. It is Plaintiffs' burden to demonstrate that a private right of action is consistent with applicable legislative intent. Plaintiffs provide very little material evidence of legislative intent, but instead opine that the various state legislatures "must have intended" a dual enforcement regime. This appeals to one's common sense, but it is more difficult to square with the text and structure of the actual provisions. Indeed, the remaining prompt pay statutes all have strong public enforcement mechanisms, including the right to impose fines, conduct hearings, and revoke certificates to sell insurance. Often, the legislature's decision to erect an express "array of administrative remedies" creates a "strong inference" that a legislature, state or federal, "did not intend to create a private right action." *Ayres v. General Motors Corp.,* 234 F.3d 514, 522–23 (11th Cir.2000). Accordingly, the remaining prompt pay claims under statutes which do not provide an express private right of

action or are not conceded by Defendants to contain an implied private right are DISMISSED.[22]

## 2. CAL. BUS. & PROFESSIONS CODE § 17200 (COUNT VIII)

The California Business and Professions Code Section 17200 defines unfair competition "as any unlawful, unfair, or fraudulent business act or practice." Cal. Bus. & Prof.Code § 17200. Under Section 17200 ("UCL"), courts may not declare a practice "unlawful" or "unfair" where the state has specifically declared the practice to be lawful. *See Cel–Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.,* 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527, 541 (1999). Defendants assert that Plaintiffs' claims are meritless under Section 17200 because (1) they impermissibly seek to convert Section 17200 into an alternative regulatory framework for managed care, and (2) they improperly seek monetary damages. The Court disagrees.

### a. Interference with the Department of Managed Health Care's Statutory Authority

 Defendants first contend that Plaintiffs impermissibly seek to convert Section 17200 into an alternative regulatory framework for managed care. Defendants claim that as these claims impermissibly intrude upon the regulatory functions of the California Department of Managed Health Care, the Section 17200 claims must be precluded.

Pursuant to the Knox–Keene Health Care Service Plan Act of 1975, a comprehensive scheme regulating almost every aspect of "health care service plans" in California has been erected. *See* Cal. Health & Safety Code §§ 1340, 1399.76; *see also id.* § 1345(f) (defining the term "health care service plan" to include HMOs). Through the Knox–Keene Act, the California legislature intended to "occupy the field" and "to vest all authority to regulate and supervise health plans in the Department [of Managed Care]." *Van de Kamp v. Gumbiner,* 221 Cal.App.3d 1260, 270 Cal.Rptr. 907, 921–22 (1990). The Department of Managed Care is granted rights to license all California HMOs, pursuant to the Knox–Keene Act. Further, the Knox–Keene Act's comprehensive scheme bars "courts [from] assum[ing] general regulatory power over the health maintenance organizations through the guise of enforcing Section 17200." *Samura v. Kaiser Foundation Health Plan,* 17 Cal. App.4th 1284, 1300–1302, 22 Cal.Rptr.2d 20 (Cal.Ct.App.1993), *cert. denied,* 511 U.S. 1084, 114 S.Ct. 1835, 128 L.Ed.2d 463 (1994).

At first blush, Defendants' position seems compelling. The Plaintiffs' claims are premised on Defendants' alleged systematic practices that deny and delay their rightful payments. However, Defendants' creative contention is not fully supported by relevant statutory or case law. Essentially, the Defendants ask this court, sitting in equity, to abstain from adjudicating the instant case. *See Desert Healthcare,* 94 Cal.App.4th 781, 795–96, 114 Cal. Rptr.2d 623. Defendants primarily cite *Desert Healthcare Dist. v. PacifiCare FHP, Inc.,* 94 Cal.App.4th 781, 794–95, 114 Cal.Rptr.2d 623 (2001) in support of its argument that courts must not accept invitations to intervene in an area of complex

---

**22.** These states are Arizona, Arkansas, California, Colorado, Connecticut, Georgia, Illinois, Kansas, Kentucky, Louisiana, Maryland, Michigan, Missouri, New Mexico, New Jersey, New York, Ohio, Tennessee, and Washington.

Plaintiffs have dropped all claims for interest under Pennsylvania's statute based upon a lower court ruling that this statute does not provide a private right of action.

economic policy. The *Desert Healthcare* court noted that adjudicating plaintiff's claim that defendant health care service plan "abused the capitation system by transferring too much risk to an intermediary without adequate oversight" under Section 17200 would require the trial court to "determine appropriate levels of capitation and oversight." *Id.* at 795–96, 114 Cal.Rptr.2d 623.

However, while the subject matter of this action may pique an academic interest of the Department of Managed Health Care, there is no evidence that this Court will engage in "broad-based complex economic regulation" if it allows the claims to proceed. In the case at bar, the Plaintiffs are not attempting to impose broad-based policy objectives on Defendants; rather they are asking the Court to enjoin current violations of their contractual duties to Plaintiffs and of relevant statutes. The remedies sought by Plaintiffs would be embedded in contractual relationships and representations made to Providers; uniform determinations of economic policy are therefore precluded by the very nature of the relief requested by Plaintiffs themselves.

Defendants' reliance on *Samura v. Kaiser Foundation Health Plan,* 17 Cal. App.4th 1284, 22 Cal.Rptr.2d 20 (1993), *cert denied,* 511 U.S. 1084, 114 S.Ct. 1835, 128 L.Ed.2d 463 (1994), in arguing that the Plaintiffs' UCL claims predicated on certain provisions of Knox–Keene Act are precluded is misplaced because the *Samura* court itself did not preclude any adjudication of claims under the UCL because of the Knox–Keene act. The Knox–Keene act arguably makes unlawful some of the challenged practices that deal with unfair payment practices. *See* Cal. Health & Safety Code § 1371.37. Yet, Section 1371.37(f) also states that *"[t]he penalties set forth in this section shall not preclude,*

*suspend, affect, or impact any other duty, right, responsibility, or obligation under a statute or under a contract between a health care service plan and a provider." Id.* (emphasis added); *see also Coast Plaza Doctors Hosp. v. UHP Healthcare,* 105 Cal.App.4th 693, 707, 129 Cal.Rptr.2d 650 (Cal.Ct.App.2002) (holding that Knox–Keene Act was not a bar to defendant health care provider's suit for reimbursement for services rendered to enrollees of health care plan). Moreover, California courts have expressly recognized that UCL claims predicated on violations of certain provisions of regulatory statutes are properly adjudicated in the courts. *See Stevens v. Superior Court,* 75 Cal. App.4th 594, 606, 89 Cal.Rptr.2d 370 (1999) ("to summarize, the [UCL] allows nearly any law or regulation to serve as its basis unless the predicate statute explicitly bars a private right of action, or the defendant is otherwise privileged or immune"). Indeed, the *Samura* court recognized that UCL actions may exist even when a separate statutory enforcement scheme such as the Knox–Keene Act exists. *Samura v. Kaiser Foundation Health Plan,* 17 Cal. App.4th 1284, 1299, 22 Cal.Rptr.2d 20 (1993).

Second, Defendants argue that this Court cannot entertain Section 17200 claims premised on practices alleged in the SAC because they have been permitted by the state regulatory structure and would countermand the state regulators' exercise of the powers of oversight. Courts cannot declare a practice "unlawful" or "unfair" under Section 17200 where the state has itself specifically declared the practice to be lawful. Rather, "[i]f the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination." *Cel–Tech Communications, Inc. v. Los Angeles Cellular Tele-*

*phone Co.*, 20 Cal.4th 163, 83 Cal.Rptr.2d 548, 973 P.2d 527, 541 (1999).

In contending that the "great bulk of practices that plaintiffs seek to challenge are affirmatively permitted by th[e] state regulatory structure" the Defendants neglect to provide any specific evidence of statutory authority for this sweeping statement. Indeed, the Court is doubtful that the automated practices alleged by Plaintiffs, such as downcoding and bundling, are accepted by the appropriate regulatory authorities. Moreover, Defendants' specific citations to California code provisions regarding setting actuarial rates for medical underwriting decisions and licensure are not applicable to the practices alleged by Plaintiff. *See, e.g.,* Cal. Health & Safety Code §§ 1349, 1351(d), 1389.2.

Finally, this Court is not compelled to automatically divest itself of Section 17200 claims in all cases involving the conduct of health care plans. Notably, in an analogous case involving allegations of unfair payment patterns, another appellate court declined to defer to the Department of Managed Health Care. *See Coast Plaza Doctors Hosp. v. UHP Healthcare*, 105 Cal.App.4th 693, 707, 129 Cal.Rptr.2d 650 (2002). Moreover, the extremely high level of intervention, oversight and management that Defendants claim will transpire should these claims proceed is simply too speculative to fix at this stage. Therefore, other cases cited by Defendants as support for their position that economic policy is being implicated are distinguishable. *See California Grocers Ass'n v. Bank of America, National Trust and Sav. Ass'n*, 22 Cal.App.4th 205, 218, 27 Cal.Rptr.2d 396 (1994) (deciding whether service fees charged by banks were too high); *Wolfe v. State Farm Fire & Casualty Ins. Co.*, 46 Cal.App.4th 554, 53 Cal.Rptr.2d 878 (1996) (requirement that insurers continue to is-

sue new homeowner policies against their will).

### b. Remedies Under Section 17200

Defendants assert that Section 17200 does not authorize claims for money damages, and that such claims must be dismissed even if labeled as "restitution." *See, e.g., Bank of the West v. Superior Court*, 2 Cal.4th 1254, 10 Cal.Rptr.2d 538, 833 P.2d 545, 555 (1992) (en banc). They argue the relief that Plaintiffs seek are unavoidably measured by the amount of damages for breach of the provider contracts, and therefore because the basis of relief is one at law, it cannot be characterized as restitution. *Stationary Engineers Local 39 Health and Welfare Trust Fund v. Philip Morris, Inc.*, 1998 WL 476265 at *18 (N.D.Cal. April 30, 1998). Thus, because the UCL does not authorize money damages for breach of contract, Defendants argue that these claims are improper.

The restitution remedy, however, is one expressly available under the UCL to ensure that victims are returned to the status quo and to also to ensure that Defendants do not gains as a result of unlawful or deceptive conduct. Recent cases hold that Section 17200 authorizes restitution and disgorgement of profits resulting from unfair competition. *See Cortez v. Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 96 Cal.Rptr.2d 518, 999 P.2d 706, 714–15 (2000) (an award for back pay could represent damages in contract action but also includes an element of restitution—the return in excess of what the plaintiff gave the defendant over the value of what the plaintiff received). Therefore, equitable damages that resemble damages at law are not necessarily precluded by the UCL. The Court recognizes, however, that this is essentially an issue of characterization. Therefore, to the extent that Plaintiffs' equitable claims are caused by

Defendants' unfair and unlawful business practices that result in compensation being withheld that rightfully belong to the Providers for services they rendered, they shall proceed. Nevertheless, if at a later date in the proceeding, the remedies at law are indeed a mirror image of the restitution remedy, the Court will allow Defendant to revisit this issue.

### 3. NEW JERSEY CONSUMER FRAUD ACT (COUNT X)

■ Defendants argue that Plaintiffs claims under the New Jersey Consumer Fraud Act, N.J.S. § 56:8–1 *et seq.* (the "New Jersey Act") are preempted by a detailed state administrative framework governing claims payments and are, in any event, deficient under the terms of the statute itself. As a threshold issue, it appears that this Count only applies to Defendant Prudential.

The New Jersey Consumer Fraud Act provides in relevant part, that:

"The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise ... or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been mislead, deceived or damaged thereby, is declared to be an unlawful practice." N.J.S. § 56:8–2.

Additionally, "[a]ny person who suffers any ascertainable loss of moneys or property ... as a result of the use or employment by another person of any method, act or practice declared unlawful by this act" may bring a claim under the statute. *Id.* § 56:8–19.

Plaintiffs allege that by failing to provide adequate reimbursement through im-plementation of the deceptive practices described in the SAC, Prudential has, in connection with the sale of health insurance, compromised the ability of physicians to provide continuity of care and the level of care by sound medical judgment by imposing financial hardships and undue burdens on physicians. SAC ¶¶ 121, 255. As such, Plaintiffs allege that the application of the New Jersey Act to the SAC will serve the interests of consumers.

The Court declines to accept Plaintiffs's expansive interpretation, as it runs afoul of decisions that have established the outer boundaries of the statute. Plaintiffs offer no compelling precedent that mandates that this Court accept the applicability of the statute to the factual scenario presented by the SAC. It is true, as Plaintiffs point out, that "[t]he language of the [New Jersey Act] evinces a clear legislative intent that its provisions be applied broadly in order to accomplish its remedial purpose, namely to root out consumer fraud," *Lemelledo v. Beneficial Mgmt. Corp.,* 150 N.J. 255, 696 A.2d 546, 551 (1997). Nevertheless, Plaintiffs' allegations fall short of alleging a *prima facie* case under the New Jersey Act in two major respects.

■■ First, Plaintiffs are not "consumers" under the Act. The Act was enacted in response to sharp practices and dealings in the marketing of merchandise and real estate. *Daaleman v. Elizabethtown Gas. Co.,* 77 N.J. 267, 390 A.2d 566, 568 (1978). In order to recover under the Act, a Plaintiff must be a consumer of the product *vis-à-vis* the defendant. *Specialty Ins. Agency v. Walter Kaye Assocs., Inc.,* 1989 WL 120752, at *5, 1989 U.S. Dist. LEXIS 11842, at *15 (D.N.J. Oct. 2, 1989) "[C]onsumers are regarded as those who both use and consume economic goods and services." *Del Tufo v. Nat'l Republican Senatorial Committee,* 248

N.J.Super. 684, 591 A.2d 1040, 1042 (1991); *Hundred East Credit Corp. v. Eric Schuster Corp.*, 515 A.2d 246, 248 (N.J.Super.A.D.1986) (consumer "uses (economic) goods, and so diminishes or destroys their utilities") (citation omitted). Therefore, economic middle-men, such as franchisors or distributors or others who merely contract for a stream of payments, are not covered. *J & R Ice Cream Corp. v. Cal. Smoothie Licensing Corp.*, 31 F.3d 1259, 1274 (3d Cir.1994); *Waterloov Gutter Prot. Sys. Co. v. Absolute Gutter Prot., L.L.C.*, 64 F.Supp.2d 398, 424 (D.N.J. 1999); *see also Windsor Card Shops, Inc. v. Hallmark Cards, Inc.*, 957 F.Supp. 562, 567 n. 6 (D.N.J.1997) (retailer not consumer of goods offered for resale to the public). The Act also does not apply to goods or services that are not available to the public at large. *BOC Group, Inc. v. Lummus Crest, Inc.*, 251 N.J.Super. 271, 597 A.2d 1109, 1112–13 (1990); *Naporano Iron & Metal Co. v. Am. Crane Corp.*, 79 F.Supp.2d 494, 508–00 (D.N.J.1999). One federal district court has even held that the Act does not apply to a "scheme to cheat" another by systematically failing to apply proper credits to the other's account. *Bracco Diagnostics, Inc. v. Bergen Brunswig Drug Co.*, 226 F.Supp.2d 557, 559–61 (D.N.J.2002).

Here, the Provider Plaintiffs cannot be considered "consumers" by any interpretive stretch of the New Jersey Act. Plaintiffs receive a "stream of income" for their services and they do not use or consume any economic goods or services offered for sale by Defendants. Nor is the provider relationship available to the public. In the SAC, Plaintiffs merely offered a conclusory allegation that they are "consumers" under the New Jersey Act. SAC ¶ 248. In response to Defendants' briefing, however, Plaintiffs now argue that there is no requirement that the Plaintiff himself be a consumer, so long as the practices complained of are carried out in connection with the sale or advertising of any merchandise, including services offered directly or indirectly to the public. For instance, the definition of "consumer" explicitly includes associations. N.J.S. § 56:8–1(d). Nevertheless, while Plaintiffs attempt to wrap themselves in the laudatory goals of the New Jersey act, the fact remains that a desire to help consumers is insufficient as a matter of law because "[t]he cause of action is created only as to bona fide consumers of the product." *See, e.g., Grauer v. Norman Chevrolet Geo*, 321 N.J.Super. 547, 729 A.2d 522, 524 (1998) (rejecting allegation that defendant committed fraud on the "general public" as basis for New Jersey Act suit). Moreover, Plaintiffs' strained interpretation is accorded even less weight in light of the New Jersey Supreme Court's explanation of the Act's purpose, which was "aimed basically at unlawful sales and advertising practices designed to induce consumers to purchase merchandise or real estate" *Daaleman v. Elizabethtown Gas Co.*, 77 N.J. 267, 390 A.2d 566, 568 (1978).

■■■ Second, Plaintiffs' provision of medical services to Defendants' insureds does not constitute the "sale" of "merchandise" under the New Jersey Act. The New Jersey Act generally does not cover disputes as to amounts owed to professionals in connection with the rendition of professional services. *Hampton Hosp. v. Bresan*, 288 N.J.Super. 372, 672 A.2d 725 (1996) (services rendered to patients pursuant to medical judgment); *Vort v. Hollander*, 257 N.J.Super. 56, 607 A.2d 1339, 1342 (1992), *certif. denied*, 130 N.J. 599, 617 A.2d 1221 (1992) (attorneys). Professional services are covered only when rendered in connection with the types of consumer transactions (*e.g.* real estate) specifically enumerated in the New Jer-

sey Act. *S & D Envt'l Servs., Inc. v. Rosenberg Rich Baker Berman & Co.,* 334 N.J.Super. 305, 759 A.2d 360, 368 (1999); *Blatterfein v. Larken Assocs.,* 323 N.J.Super. 167, 732 A.2d 555, 562 (1999). Plaintiffs attempt to argue that the fraudulent practices they contest are actually those of Defendants in administering their health care plans, not those vis-à-vis the providers themselves. They cannot, however, escape the abundance of allegations in the SAC where they allege in detail Prudential's harmful activities aimed at physicians. Nor can they ultimately ignore the heavy weight of case law that precludes their claim.

## F. MEDICAL ASSOCIATION STANDING

This court is a court of limited jurisdiction with the power to review only concrete controversies brought by plaintiffs with standing to raise the issue they seek to have the court decide. *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The doctrine of standing serves to "identify those disputes which are appropriately resolved through the judicial process." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Defendants contend that the six medical associations[23] ("Associational Plaintiffs") that appear as Plaintiffs in the newest *Shane* complaint do not possess standing. Defendants contest standing because there has been insufficient associational "injury in fact" to have standing, and second, the

Associational Plaintiffs have no derivative standing to sue on behalf of their members because the relief requested cannot be achieved demonstrably independent of securing the participation of their members in the lawsuit. In this action, the Associational Plaintiffs assert claims on their own behalf to vindicate "associational injuries" and on behalf of their members.[24] *See, e.g.,* SAC ¶¶ 32, 35. The Court first turns to the issue of individual standing.

## 1. INDIVIDUAL STANDING: INJURY–IN–FACT

In order to allege a direct injury to the organization, at an "irreducible constitutional minimum," the Associational Plaintiffs must allege (1) a cognizable "injury in fact" which is an invasion of a legally protected interest that is both "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical;'" (2) a "causal connection between the injury and the conduct complained of" that is fairly traceable to the challenged action; and (3) a likelihood, as opposed to a mere speculative possibility, that the injury will be "redressed by a favorable decision." *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

The Associational Plaintiffs allege, among other things, that the systemic practices being challenged in this lawsuit have caused them to lose membership and to expend their own time and resources fighting Defendants' tactics. SAC ¶¶ 30–44. Defendants claim that the Associa-

---

**23.** California Medical Association, the Denton County Medical Society, the Medical Association of Georgia, the Texas Medical Association, the Florida Medical Association and the Louisiana Medical Society.

**24.** The Associational Plaintiffs only join selected claims asserted by the Provider Plaintiffs claims for RICO conspiracy under 18

U.S.C. § 1962(d); aiding and abetting RICO violations; breach of contract; "quasi-contract"; violations of the Connecticut Unfair Trade Practices Act, and violations of the New Jersey Consumer Fraud Act. The California Medical Association also asserts claims under California's "Unfair Competition Law," Cal. Bus. & Prof.Code § 17200.

tional Plaintiffs lack any direct organizational injury because there are no "discrete programmatic concerns," and further the Complaint lacks an objectively quantifiable, concrete set of costs, other than the cost of this litigation. For example, exploring Plaintiffs' allegations that delayed and denied payments to individual physicians ultimately depress aggregate membership levels would require a speculative tracing of economic ripple-effects through the associations' membership rolls. *See National Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1431 (D.C.Cir.1995) (allegation that challenged regulations raising taxes on contributions to non-profit organizations had the effect of "undercutting NTU's fund-raising initiatives" is "entirely speculative"). Further, Defendants argue that these supposed injuries in fact would be entirely speculative and hopelessly attenuated because proof of causation would be extremely difficult.

■ Defendants, however, wade into territory that need not be entered at this stage of the proceeding. *See Havens Realty Corp. v. Coleman,* 455 U.S. 363, 378–79, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982). As the Supreme Court explained in *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130, when it comes to standing, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim." *Id.* (internal quotations and alterations omitted); *see also Bischoff v. Osceola County, Fla.,* 222 F.3d 874, 878 (11th Cir.2000) ("[G]eneral factual allegations of injury resulting from the defendant's conduct may be sufficient to show standing."). Here, the allegations, if proven, constitute injuries in fact that are likely to be redressed by a favorable outcome and thus are sufficient to confer standing. *See, e.g., Havens Re-*

*alty Corp,* 455 U.S. at 379, 102 S.Ct. 1114 (association had standing when the defendant's conduct caused more than a setback to its abstract social interests, specifically including injury to its counseling activities and a drain on its resources); *Thompson v. Metropolitan Multi-List, Inc.,* 934 F.2d 1566, 1571 (11th Cir.1991)(allegations of membership loss due to Defendants' activities was sufficient); *Robinson v. Block,* 869 F.2d 202, 207, 210 n. 9 (3d Cir.1989)(organization forced to expend time, money, and resources advocating on behalf of welfare recipients had standing).

Contrary to the cases cited by Defendants where associations were found not to have standing, the Associational Plaintiffs in this case are distinguishable because they are narrowly focused on the medical field and provide more services than just general advocacy and policy work. *See National Taxpayers Union, Inc. v. United States,* 68 F.3d 1428, 1431 (D.C.Cir.1995) (non-profit organization challenging general Federal tax increases); *Colorado Taxpayers Union, Inc. v. Romer,* 963 F.2d 1394 (10th Cir.1992) (non-profit association challenging government expenditures spent to defeat referendum). Indeed, there is a significant difference between associations that further certain abstract and philosophical interests, such as environment and taxation, with member-driven organizations such as the Associational Plaintiffs ostensibly dedicated to the holistic welfare of their physicians as well as the practice of medicine. Surely then, allegations that the Defendants have interfered in medical treatment decisions and developed systemic practices regarding payments directly affect medical associations who must deal with the fallout of such behavior. Accordingly, because the Court finds that the Associational Plaintiffs have sufficiently alleged the elements of individual standing, they are properly before this court.

## 2. REPRESENTATIVE STANDING

 Even assuming that the association has not suffered an injury-in-fact, Plaintiffs contend that an association may have standing "solely as a representation of its members." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The Supreme Court has recognized an exception to the general ban on third-party standing in cases where organizations sue on behalf of its members. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Under the test outlined in *Hunt,* the prerequisites for association standing are three-fold. First, the association's members must otherwise have standing to sue in their own right. *Id.* Second, the interests that the association "seeks to protect [must be] germane to the organization's purpose." *Id.* And, third, both the claim asserted and the relief requested must be demonstrable independently of "participation of individual members in the lawsuit." *Id.*

Both parties concede that the first element is satisfied. Although the main-track Defendants effectively concede the existence of the second element, Defendant Coventry argues that the Medical Association of Georgia and Louisiana State Medical Society ("LSMS") fail to meet the second prerequisite because the interests they seek to assert in this case are not "germane" to their organizational purposes because the "stated mission" of LSMS—"to provide leadership for the advancement of the health of the people of Louisiana"—cannot be construed to include litigating its physicians members' contracts, nor do the Plaintiffs aver that the society's 6,800 members joined LSMS with this purpose in mind. *Id.* at ¶ 42. *See, e.g., Brotherhood of Teamsters v. Brock,* 812 F.2d 1235, 1239 (9th Cir.1987) (challenge to racketeering act disqualifying persons convicted of

certain crimes from seeking employment in a labor organization was not germane to the purpose of a labor union). This contention, however, must be rejected. Courts have cautioned against reading the germaneness test too restrictively, emphasizing that the standard is "undemanding" and that there need be only "mere pertinence" between the subject of the litigation and the organizational purpose. *See, e.g., Humane Society v. Hodel,* 840 F.2d 45, 58 (D.C.Cir.1988). Moreover, the practices challenged in this case go to the heart of the problems confronting the medical profession today, and are pertinent to the work of the two associations in representing and advocating for their physician members. Accordingly, the second element is clearly met.

The parties primarily dispute the existence of the third *Hunt* requirement. Defendants argue that extensive member participation will be necessary to both prove the Associational Plaintiffs' claims and recover damages on their behalf. Defendants claim this case is based upon allegations of fraud and "failing to disclose internal policies" that result in the Defendants' non-compliance with their contractual and non-contractual obligations. As such, resolution of this issue would require an investigation into the particular contracts signed by particular physicians not to mention whether arbitration agreements are included. Defendants also contend that the monetary relief requested for violations of the RICO statute would involve individualized investigations because associations have been barred from seeking monetary relief on behalf of their members. *See United Union of Roofers, Waterproofers, and Allied Trades No. 40 v. Insurance Corp. of Am.,* 919 F.2d 1398, 1400 (9th Cir.1990); *see also Warth v. Seldin,* 422 U.S. 490, 515, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975) (where damages sought on behalf of members, "whatever injury

may have been suffered is peculiar to the individual member concerned, and both the fact and extent of injury would require individualized proof," a fact that precludes derivative association standing); *Friends for American Free Enter. Ass'n v. Wal–Mart Stores, Inc.*, 284 F.3d 575, 577 (5th Cir.2002) (claims for tortious interference of contract would require individualized proof, precluding derivative associational standing).

In certifying the Provider class, this Court has already held that Plaintiffs' allegations can be resolved by the means of common proof and that individual issues do not predominate. *See In re Managed Care Litig.*, 209 F.R.D. 678, 694–97 (S.D.Fla.2002) ("numerous issues are common to all claims... [I]n addition, the global class issue of whether a conspiracy exists, and if so, the extent of its impact is necessarily a common question which predominates in this action."). Moreover, when confronted by similar allegations, other courts have specifically rejected Defendants' arguments in the context of challenges to the alleged abusive practices of managed care companies. For example, in *Pennsylvania Psychiatric Society v. Green Spring Health Servs.*, 280 F.3d 278, 286 (3rd Cir.2002), the plaintiff medical association had voiced concerns about the *methods* that Defendants Managed Care companies employed for making decisions regarding patient care. *Id.* at 286 (emphasis in original). The *Green Spring* court determined that on a motion to dismiss, the pleadings sufficiently alleged that the medical association could establish the alleged violations without significant individual participation. *Id.* Similarly, the SAC allegations centers on a broad-based scheme where systemic techniques are used to make decisions regarding patient care and compensation for treatment.

Second, the Associational Plaintiffs are not seeking damages for their members, only injunctive and declaratory relief. *See* SAC ¶ 30. It is well-established that an association may seek equitable relief on behalf of its members without running afoul of the third prong of the *Hunt* test. *See, e.g., Hunt v. Washington State Apple Advert. Comm.*, 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Thompson v. Metropolitan Multi-List, Inc.*, 934 F.2d 1566, 1571–72 (11th Cir.1991).

Defendant Coventry advances several additional arguments that are similarly without merit. First Coventry argues that associations cannot obtain equitable relief under RICO. This argument has been discussed *supra*. Second, Coventry asserts that the Associational Plaintiffs' members have an adequate remedy at law for the remaining claims in the complaint. However, Plaintiffs correctly argue that whether money damages will prove to be an adequate remedy at law cannot be determined at this state of the proceeding. Finally, Coventry contends that the absence of any individual Plaintiffs from Louisiana precludes the Louisiana State Medical Society from obtaining relief. There is no requirement, however, for an association suing on behalf of its members be joined by any of them in order to bring a valid claim. *See, e.g., Doe v. Stincer*, 175 F.3d 879, 882 (11th Cir.1999)("an association may bring suit on behalf of its members or constituents despite the fact that individual members have not actually brought suit themselves"). Accordingly, this Court finds that, in addition to having standing in their individual capacities, the Associational Plaintiffs also possess standing in a representative capacity.

## G. PARENT–SUBSIDIARY RESPONSIBILITY

In the SAC, Plaintiffs assert two theories to hold the HMO holding compa-

nies liable for their subsidiaries' acts: (a) an alter ego theory to "pierce the corporate veil" and (b) vicarious liability based on actual agency principles. Plaintiffs have sued the parent corporations rather than entities licensed in each State to administer and market health-coverage products, reasoning that "all substantive practices are established, implemented, monitored and ratified by" those parent companies and that "[l]ocal subsidiaries or affiliates of the named defendants do not function as independent corporate entities but rather have an alter ego relationship with the named defendants and function as agents under the Defendants' direction and control." SAC ¶ 45. Among the tools used by the parent companies to defraud Plaintiffs include the alleged auto-adjudication scheme.

Defendants contend that Plaintiff's allegations of individual liability of Defendant parent companies are insufficient to state a cause of action under settled principles of corporate liability. They claim that it is a "general principles of corporate law deeply ingrained in our economic and legal systems that a parent corporation ... is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998). Defendants argue that this presumption can only be overcome upon well-pleaded allegations that the subsidiary is a "sham" corporation amounting to no more than the "alter-ego" of the parents. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110–11, 89 S.Ct. 1562, 23 L.Ed.2d 129 (1969) (parent is not liable for judgment entered against subsidiary unless subsidiary is shown to be its alter ego). Therefore, under the law of the state in which the corporation is domiciled, each subsidiary corporation must be shown to be a mere "sham." Defendants argue that Plaintiffs' alter ego allegations are pleaded without relevant factual support.

■ The Court finds that Plaintiffs sufficiently alleged direct liability of the parent corporations. First, although Plaintiffs have offered a menu featuring three theories of parent-subsidiary liability, they are primarily alleging that Defendants are subject to direct, rather than derivative or vicarious liability. *See SAC* ¶ 45 ("all of the substantive practices, policies, and procedures of the Defendants' health plans are established, implemented, monitored, and ratified by the Defendants *themselves* ")(emphasis added). The Supreme Court has noted that in cases where the "alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management" and "the parent is directly a participant in the wrong complained of" will, in such "instances, [be] directly liable for its own actions." *United States v. Bestfoods*, 524 U.S. 51, 64–65, 118 S.Ct. 1876, 141 L.Ed.2d 43 (1998) (citations omitted). Direct liability is therefore imposed when the parent has "forced the subsidiary to take the complained-of action in disregard of the subsidiary's distinct legal personality." *Pearson v. Component Technology Corp.*, 247 F.3d 471 (3rd Cir.2001) (quoting *Esmark, Inc. v. NLRB*, 887 F.2d 739, 756–57 (7th Cir.1989)). While the question of proof is a matter for a different day, in alleging that the parent corporations directly participated in formulating and implementing the auto-adjudication claim schemes, the Plaintiffs have met their burden at this stage of the proceedings.[25]

25. In finding that the Plaintiffs have successfully alleged direct liability, the Court does not reach the two other bases of parent-subsidiary liability: (a) the agency theory where the parent corporation uses a subsidiary to do its bidding; and (b) the instrumentality theory, under which the plaintiff must establish that the parent exercised a significant degree

## IV. CONCLUSION

THE COURT has considered the motion, the responses and the pertinent portions of the record, and being otherwise fully advised in the premises and in open court, it is

**ADJUDGED** that the joint motion to dismiss (**D.E. No. 1662**) is GRANTED *in part* and DENIED *in part, with prejudice,* consistent with the above opinion. Accordingly, Counts IX and X are dismissed in their entirety.

of control over the subsidiary's decision-making. *See, e.g., Frank v. West,* 3 F.3d 1357, 1362 n. 2 (10th Cir.1993) (veil will be pierced when "parent exercises extensive control over the acts of the subsidiary giving rise to the claim of wrongdoing").